[No. 40737-0-II.   Division Two.   August 8, 2012.]

M.R.B. ET AL., *Appellants*, v. PUYALLUP SCHOOL DISTRICT, *Respondent*.

838

*John R. Connelly Jr.* and *Nathan P. Roberts* (of *Connelly Law Offices*) and *Philip A. Talmadge* and *Sidney C. Tribe* (of *Talmadge/Fitzpatrick PLLC*), for appellants.

*Michael A. Patterson* and *Donald F. Austin II* (of *Patterson Buchanan Fobes Leitch & Kalzer*) and *Thomas E.M. Hutton*, for respondents.

*Stewart A. Estes* on behalf of Washington Defense Trial Lawyers, amicus curiae.

*Ambika K. Doran* and *Frank Lomonte* on behalf of Student Press Law Center et al., amici curiae.

*Melissa O'Loughlin White* and *Ramona N. Hunter* on behalf of Washington Defense Trial Lawyers, amicus curae.

¶1 PENOYAR, J. — In February 2008, Emerald Ridge High School's student newspaper, the *JagWire*, published an issue featuring articles on oral sex. Four students quoted in the newspaper and their parents (collectively Students)

sued the Puyallup School District (District), claiming invasion of privacy, negligent hiring and supervision, negligence, and outrage. Ultimately, the jury returned a verdict in the District's favor.

¶2 The Students appeal the trial court's order denying their CR 59 motion for a new trial, arguing that the trial court erred by denying their motion because (1) the trial court committed errors of law when it ruled that the *JagWire* was a limited public forum and waited to rule until after the parties had presented their cases, (2) the District committed misconduct at trial when it presented evidence and elicited testimony on the journalism teaching theory of "open forum" in Emerald Ridge's newspaper production course, (3) the manner in which the District used the Students' statements of damages at trial constituted misconduct, (4) other irregularities in the trial court's proceedings deprived the Students of a fair trial, and (5) substantial justice has not been done. We affirm.

## FACTS

### I. BACKGROUND

¶3 Emerald Ridge students produced the *JagWire*, a high school newspaper, in their newspaper production course. In the 2007-08 school year, Kevin Smyth taught the class. Smyth attended a journalism conference before the school year started, but that was his first year advising a journalism class. The students were responsible for all publication decisions, ranging from advertising to design. Students received credit and letter grades for the course; the District paid for the instructor. Smyth instructed the students on topics such as the First Amendment, open forum, journalism ethics, the *Associated Press Stylebook*, and attribution. The class was intended to be an active, student-centered learning environment rather than a traditional classroom. The editorial board, made up of five students, made editorial decisions.

¶4 During the 2007-08 school year, the newspaper production students decided to focus a *JagWire* issue on the topic of oral sex. In February 2008, the students distributed an anonymous, optional survey to the student body, asking questions relating to sex, oral sex, drugs, and alcohol. Editorial board member DW then interviewed each of the students who are plaintiffs in this case during lunch at school. DW testified that in every interview, she wore a *JagWire* badge and identified herself as a *JagWire* staff member. She also explained the article's topic and asked each student if she could quote them. Finally, she expressly invited her subjects to decline to be interviewed or to decline to answer any question. Each of her subjects agreed to be interviewed. DW recorded each interview and later took notes from the recordings. DW interviewed additional subjects, but the editorial board removed their quotes when those students asked that their quotes be removed or that they be quoted anonymously.

¶5 Smyth reviewed the issue before it was published. The editorial board also consulted with Jeff Nusser, the prior journalism advisor, who suggested that the student journalists confirm that they had permission from the quoted students before publication. DW assured Smyth that she had obtained consent to name the students. Smyth asked that DW confirm consent a second time with each quoted student. DW did not do so.

¶6 The *JagWire* issue containing the section on oral sex was published in late February 2008. The issue contained the following: a provocative photograph on the front cover, an article entitled "Oral Sex at [Emerald Ridge:] Students are having oral sex and it is not talked about in school," an article on media and pop culture's impact on the sexual behavior of teenagers, a list of sexually transmitted diseases that one can acquire if engaging in oral sex, a "[p]hysiological" explanation of the body's reaction to oral stimulation, and two contrary columns on whether oral sex is moral. Ex. 142, at 12, 14. In the issue, large quotes from

several students were enlarged and highlighted against additional provocative photographs. The quotes, referred to by the *JagWire* staff as "sextimonials," stated the following:

> "Honestly I feel like it offers a lot more to the relationship because you kind of get bored if you're not engaging in other activities. It's ok because it's with someone I really care about." [MLF], junior [*has participated in oral sex and sex*]

> "When people just rush into it, like me and [KBW] we waited a year (and a year is a really long time). I thought we waited the perfect amount of time because I was ready. It's not something I want to regret. I don't really regret anything like mistakes and I don't think it was a mistake." [WRH], senior [*has participated in oral sex and sex*]

> "I was 15. I was horny. It wasn't really a relationship at that point. I'd known the guy for a week." [MRB], senior [*has participated in oral sex*]

> "We'd already been going out for a year and we were in Mexico." [KBW], senior [*has participated in oral sex and sex*].

5 Report of Proceedings (RP) at 752; Ex. 142, at 12-13. Another student was quoted but is not a plaintiff in this case.

¶7 After the publication of the issue, Emerald Ridge High School Principal Brian Lowney issued a letter of reprimand to Smyth because he believed that Smyth had exercised poor judgment "regarding some content, survey methods approval, suggestive photos and the naming of sources." 4 RP at 481. On March 15, the issue won first place "best in show" at the Washington Journalism Education Association conference. 4 RP at 488. In October 2008, the District revised its policy and, now, "prior to . . . publication, [Lowney is] required to read and approve or disapprove of anything that's printed in the newspaper." 4 RP at 500.

II. Procedural History

¶8 On January 7, 2009, the Students sued the District, alleging invasion of privacy, negligent hiring and supervi-

sion, negligence, and outrage. The Students alleged that as a result of the publication, they were subject to sexual harassment, embarrassment, extreme humiliation, ridicule, severe emotional distress, psychological damage, and harm to their reputations.

## A.   Summary Judgment

¶9  The District moved for summary judgment on all claims on the ground that the *JagWire* was a "public forum" and the editorial board's decisions were outside school personnel control. The District argued that had district personnel involved themselves in editorial decisions, it would have improperly interfered with the students' constitutional rights. The District contended that because it did not and could not oversee the paper, it could not be liable for the student editorial board's actions. The trial court denied the motion.

## B.   Motions in Limine

¶10  At trial, both parties agreed that the trial court would determine as a matter of law the type of forum that existed at Emerald Ridge. The Students moved in limine to prevent the District from arguing that "they are not responsible due to an 'open/public forum' practice they now contend that they had for their school newspaper." 2 Clerk's Papers (CP) at 235. The Students moved to exclude any argument or implication "that the so-called 'open forum practice' allowed [the District] to delegate its duty to protect the plaintiffs from foreseeable harm," that only the newspaper students were responsible for the decision to publish names of sources, that the District's open forum practice "prevented it from controlling the content of its student paper," or that "the U.S. or Washington constitutions interfered with its duty of reasonable supervision." 2 CP at 236, 238, 243. Finally, the Students moved to exclude any "lay testimony regarding the law of 'open/public forum' or on any other legal issue in this case." 2 CP at 245. The trial court granted the motion

regarding lay testimony as to the law and reserved ruling on the other motions. Midtrial, the Students filed a renewed motion in limine regarding "Testimony to Legal Conclusions & Jury Nullification." 3 CP at 523.

## C. Trial Testimony

¶11 At trial, the District explained that the *JagWire* operated under the educational practice of what it referred to as an "open forum." "[U]nder an open forum, students are in control of the content and the design of the newspaper." 5 RP at 738. Smyth understood his role, as the journalism advisor, was to "ensure that we didn't publish things that were not protected speech" or that violated school policy. 5 RP at 743.

¶12 The District's policy on "Freedom of Expression" at the time, Policy 3220, governed the production of high school newspapers in the District:

The free expression of student opinion is an important part of education in a democratic society. Students' oral and written expression of their own private opinions on school premises is to be encouraged so long as it does not substantially disrupt the educational process or interfere with the right of others in the unique circumstances of the educational environment.

. . . .

A. Student Publications

Student publications produced as part of the school's curriculum or with the support of the associated student body fund are intended to serve both as vehicles for instruction and student communication. They are operated and substantively financed by the district. Material appearing in such publications should reflect all areas of student interest, including topics about which there may be controversy and dissent. Controversial issues may be presented provided that they are treated in depth and represent a variety of viewpoints. Such materials may not: be libelous, obscene or profane; cause a substantial disruption of the school, invade the privacy of others; demean

any race, religion, sex, or ethnic group; or, advocate the violation of the law or advertise tobacco products, liquor, illicit drugs, or drug paraphernalia.

The Superintendent shall develop guidelines to implement these standards and shall establish procedures for the prompt review of any materials which appear not to comply with the standards.

1 CP at 79-80. In February 2008, no guidelines existed.

¶13 The *JagWire* issue included an editorial mission statement, which reads, in part, "As an open forum, *JagWire* exercises student free expression rights to their fullest extent." Ex. 142, at 9. The front page included the caption "An Open Forum for Student Expression." Ex. 142, at 1. Under District and *JagWire* policy, no school personnel reviewed the issue beyond the advisor, Smyth.

### D. Jury Instructions

¶14 Throughout the trial, the parties vigorously disputed jury instructions regarding the type of constitutional forum that existed at Emerald Ridge.

¶15 The District moved for judgment as a matter of law under CR 50, arguing that an open forum existed and that the District was not responsible for the independent actions of the student journalists. The trial court denied the District's motion.

¶16 The trial court ruled that the *JagWire* was a "limited open forum." 13 RP at 2428. The parties debated how to appropriately instruct the jury as to that fact. The trial court rejected several instructions both sides proposed, including the Students' proposed instruction 27, which stated:

Students in public schools are not entitled to engage in speech which school authorities have reason to believe will substantially interfere with the work of the school or impinge upon the rights of other students.

Educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in

school-sponsored student newspapers so long as their actions are reasonably related to legitimate educational concerns. School officials need not tolerate speech that is vulgar or lewd, that invades the privacy of others, that interferes with the rights of other students, or that is otherwise inconsistent with the school's basic educational mission.

3 CP at 522. The Students modified instruction 27 and then proposed it as instruction 36. The instruction stated:

Students in public schools are not entitled to engage in speech which school authorities have reason to believe will substantially interfere with the work of the school or impinge upon the rights of other students.

Educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored student newspapers so long as their actions are reasonably related to legitimate educational concerns.

3 CP at 542.

¶17 Ultimately, the trial court did not issue either of the proposed instructions; however, the jury received the following instruction:

Student journalists possess a First Amendment right to freedom of speech and press. Educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored student newspapers so long as their actions are reasonably related to legitimate educational concerns.

4 CP at 606 (Instruction 20).

E. Statements of Damages

¶18 As RCW 4.28.360[1] requires, the Students did not specify an amount of damages in their complaint. Pretrial,

---

[1] RCW 4.28.360 states:

In any civil action for personal injuries, the complaint shall not contain a statement of the damages sought but shall contain a prayer for damages as shall be determined. A defendant in such action may at any time request a statement from the plaintiff setting forth separately the amounts of any special damages and general damages sought. Not later than fifteen days after service

the District requested a statement of damages from each plaintiff as RCW 4.28.360 permits. Each plaintiff submitted a statement of damages stating, in part, "Juries in similar cases involving public ridicule, embarrassment, and invasion of privacy have awarded general damages in the $2 million to $4 million range. An award within this range would be appropriate in this case." 4 CP at 685, 688, 691, 694, 697, 700, 703, 706. At trial, the District referred to the Students' statements of damages in its opening and closing arguments. Further, the District questioned each plaintiff regarding the statements of damages.

¶19 The Students objected to the admission of the statements of damages into evidence. But the Students did not bring a motion in limine on the District's use of the statements of damages, and they did not object to the District's arguments or questioning of the plaintiffs.

F. Verdict

¶20 The jury found in the District's favor. The Students moved for a new trial under CR 59(a). The trial court denied the motion. The Students appeal.

ANALYSIS

Motion for a New Trial

¶21 The Students argue that the trial court erred by denying their motion for a new trial because (1) under CR 59(a)(8), prejudicial errors of law occurred when the trial court ruled that the *JagWire* was a limited public forum and waited to issue its ruling until after the parties had presented their cases; (2) under CR 59(a)(2), the District committed misconduct at trial when it elicited testimony on the open forum teaching method and presented evidence of the Students' statements of damages at trial; (3) under CR 59(a)(1), other irregularities in the trial court's proceedings

of such request to the plaintiff, the plaintiff shall have served the defendant with such statement.

deprived the Students of a fair trial; and (4) under CR 59(a)(9), substantial justice has not been done. We disagree.

### A. Standard of Review

¶22 We review a trial court's denial of a motion for a new trial under CR 59(a)(1), CR 59(a)(2), and CR 59(a)(9) to determine whether " 'such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent [the] litigant from having a fair trial.' " *Aluminum Co. of Am. v. Aetna Cas. & Sur. Co.*, 140 Wn.2d 517, 537, 998 P.2d 856 (2000) (internal quotation marks omitted) (quoting *Moore v. Smith*, 89 Wn.2d 932, 942, 578 P.2d 26 (1978)); *Sommer v. Dep't of Soc. & Health Servs.*, 104 Wn. App. 160, 170, 15 P.3d 664 (2001). But when an error of law is cited as grounds for a new trial under CR 59(a)(8), we review the alleged error of law de novo. *See Detrick v. Garretson Packing Co.*, 73 Wn.2d 804, 812, 440 P.2d 834 (1968). The error of law complained of must be prejudicial. *Dickerson v. Chadwell, Inc.*, 62 Wn. App. 426, 429, 814 P.2d 687 (1991). We review a trial court's denial of a new trial more critically than we do its grant of a new trial because a new trial places the parties where they were before, but a decision denying a new trial concludes their rights. *State v. Taylor*, 60 Wn.2d 32, 41 n.11, 371 P.2d 617 (1962).

### B. Civil Rule 59(a)(8): Error of Law

¶23 The Students contend that the trial court erred when it denied their motion for a new trial under CR 59(a)(8). A motion for a new trial under CR 59(a)(8) may be granted when there is an "[e]rror in law" that "materially affect[ed] the substantial rights" of the aggrieved party and it is "objected to at the time by the party making the application."

¶24 The Students contend that errors of law occurred at trial when the trial court erroneously (1) ruled that the *JagWire* was a limited open forum, (2) waited to rule on the forum issue until after trial, and (3) issued inadequate jury instructions. We disagree.

### 1. Trial Court's Forum Ruling

#### a. Type of Forum

¶25 The Students contend that the *JagWire* was a "*Hazelwood*[2] non-public forum" and thus the trial court erred by ruling that the *JagWire* was a limited open forum. Appellant's Br. at 30. But the trial court's forum ruling was unimportant unless it affected the Students' right to a fair trial. And here, the jury was (1) not informed of the trial court's forum ruling and (2) given proper instruction on a critical issue in this case—the District's authority to prevent the publication at issue:

> Student journalists possess a First Amendment right to freedom of speech and press. Educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored student newspapers so long as their actions are reasonably related to legitimate educational concerns.

4 CP at 606 (Instruction 20). Thus, the remaining forum issue is whether the trial court allowed evidence and discussion of the forum issue that could have led the jury away from this correct statement of the law and prejudiced the Students' right to a fair trial.

#### b. Timing of Ruling

¶26 The Students also assert that the trial court should have made the forum determination before trial. The District contends that "[s]uch a ruling at that stage of the proceedings was both unnecessary and impractical." Resp't's Br. at 32. We agree with the District.

¶27 As the District points out, "An early ruling was unnecessary because the legal determination as to the type of forum at issue was irrelevant to the factual questions

---

[2] *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S. Ct. 562, 98 L. Ed. 2d 592 (1988).

the jury was to consider, which concerned the tort claims that were the basis of the suit." Resp't's Br. at 32. The parties' theories of the case did not depend on the forum determination.

¶28 Here, the District introduced evidence that the *JagWire* was an open forum to describe the teaching method employed in Emerald Ridge's newspaper production class. The term "open forum" "denotes a widely understood—and widely practiced—journalism pedagogy in which student journalists have the responsibility to select topics, develop and write stories, design the layout of the paper, choose advertisers, and do so without censorship as long as they adhere to a limited set of restrictions." Resp't's Br. at 30.

¶29 While we often evaluate differing views on the nature and effect of evidence presented at a trial, we do not often see interpretations as starkly disparate as those offered here. Characterizing the District's presentation of open forum evidence as "misconduct" and citing "egregious" examples of "deceptive conflation," the Students claim that the District "regaled the jury with misinformation, arguing that the District's act of publishing students' personal sexual histories and details was *compelled by the First Amendment*." Appellants' Reply Br. at 16, 20; Appellants' Br. at 36. For its part, the District claims that the Students "flatly misstate the record. The District scrupulously observed the trial court's warning against legal testimony and argumentation to the jury." Resp't's Br. at 34. While abrasive, these whetstones do little to sharpen the issue.

¶30 Here, the forum evidence could have potentially confused the jury in distinguishing between issues of duty and breach and issues of defense: The District offered evidence that the open forum teaching method, as applied, met its duty of reasonable care. The Students feared that the jury would conclude that the Constitution prohibited the District from preventing publication. The problem arose because the philosophical language supporting open forum teaching is similar to the language of First Amendment law.

¶31 We find no fault with the argument that the District was entitled to present evidence that the open forum teaching method was consistent with the District's duty of reasonable care toward the Students. The First Amendment background for the teaching method was also admissible for the same reasonableness issue. We agree that there was the potential for juror confusion. But our review of the record shows that when First Amendment language came out in the testimony, it was generally clear that it related to the teaching method, not to the District's right to prohibit publication. In addition, we conclude below that the jury instruction on the District's editorial rights correctly stated the law. Finally, we find no suggestion in the District's closing argument that they were constitutionally constrained. We discern no reversible error in the admission of open forum or First Amendment evidence. Any delay in the trial court's forum ruling was thus harmless.

### 2. Jury Instructions

¶32 Next, the Students contend that the trial court erred by denying their motion for a new trial because the trial court issued inadequate jury instructions. The Students argue that "[t]he First Amendment was not applicable law in this case. And the lack of any clarification on the forum issue misled the jury [into] thinking that the District's 'open forum' evidence and defense were valid." Appellants' Reply Br. at 11. We disagree.

¶33 Jury instructions are sufficient if they (1) permit each party to argue his theory of the case; (2) are not misleading; and (3) when read as a whole, properly inform the trier of fact of the applicable law. *Knowles v. Harnischfeger Corp.*, 36 Wn. App. 317, 321, 674 P.2d 200 (1983).

¶34 After the trial court issued a forum ruling, the District's counsel asserted, "It's no longer necessary for the jury to be instructed on the First Amendment." 13 RP at 2505. The Students' counsel, however, requested such an instruction:

[T]hroughout this case we've had direct testimony from witnesses and people gesturing at the American flag and talking about the Constitution. And the argument and the implication has been that whatever was in this article was somehow protected. We've known that it's not, and there needs to be an instruction that says that. . . . *Hazelwood* allows the district to screen the paper to protect the students from harm. *McCleod*[3] says they had a duty to do it. We need both of those instructions in order for the jury to understand how the First Amendment plays out in the school district context.

13 RP at 2505-07. In *Hazelwood*, the United States Supreme Court held "that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." 484 U.S. at 273. Here, the trial court ultimately issued instruction 20, an instruction that closely mirrored the *Hazelwood* holding, to the jury:

> Student journalists possess a First Amendment right to freedom of speech and press. Educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored student newspapers so long as their actions are reasonably related to legitimate educational concerns.

4 CP at 606 (Instruction 20).[4] During closing argument, the Students' counsel asked the jurors to look at instruction 20 and remarked on "[t]he importance of [instruction 20]." 14 RP at 2677. The Students' counsel then summarized the testimony of its witnesses and argued that "educators never give up control of [the journalism class]" and "[w]hen we're talking about whether or not you can turn your newspaper

---

[3] *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 255 P.2d 360 (1953).

[4] The Students assign error to the trial court's denial of their proposed jury instructions, but they present no argument relating to how the proposed instructions would have been more adequate.

over to the students, the answer . . . is, no, you can't." 14 RP at 2677.

¶35 Here, the instruction allowed the Students to argue their theory of the case: that the District was negligent in failing to exercise editorial control over the content of the *JagWire*. The instruction also allowed the Students to address their concern that references at trial to the First Amendment had led the jury to believe that the articles were "somehow protected." 13 RP at 2505. No additional instruction was necessary.

¶36 The Students do not assert that the jury instruction misstated the law. Rather, the Students assert that the "lack of any clarification on the forum issue misled the jury [into] thinking that the District's 'open forum' evidence and defense were valid." Appellants' Reply Br. at 11. But, although we have noted that there was potential for confusion, instruction 20 allowed the Students' counsel adequate latitude to clarify the issues under the proper standard. As we have noted, the District acted properly when it elicited testimony and evidence that the *JagWire* was an open forum. Therefore, the trial court did not err by denying the Students' motion for a new trial on this ground.

## C.   Civil Rule 59(a)(2): Misconduct of Prevailing Party

¶37 Next, the Students allege that under CR 59(a)(2),[5] the trial court erred by not granting the Students' motion for a new trial due to counsel misconduct in the manner in which counsel (1) discussed the open forum and First Amendment issues and (2) used the Students' statements of damages. Having already stated our conclusion that the forum evidence did not result in prejudicial error, we address only the statement of damages issue.

---

[5] The Students cite CR 59(a)(7), which permits a trial court to grant a motion for a new trial when "there is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary to law." But because they argue that the District committed "misconduct," we assume that the Students meant to cite CR 59(a)(2).

■■ ■■ ¶38 CR 59(a)(2) permits a trial court to grant a new trial based on "[m]isconduct of [the] prevailing party." Again, such misconduct must "materially affect[ ] the substantial rights" of the moving party. CR 59(a); *Aluminum Co. of Am.*, 140 Wn.2d at 538. In order to obtain a new trial:

> "[a]s a general rule, the movant must establish that the conduct complained of constitutes misconduct (and not mere aggressive advocacy) and that the misconduct is prejudicial in the context of the entire record. . . . The movant must ordinarily have properly objected to the misconduct at trial, . . . and the misconduct must not have been cured by court instructions."

*Aluminum Co. of Am.*, 140 Wn.2d at 539 (second and third alterations in original) (quoting 12 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 59.13[2][c][i][A] at 59-48 to 59-49 (Daniel R. Coquillette et al. eds., 3d ed. 1999)). " '[A]bsent an objection to counsel's remarks, the issue of misconduct cannot be raised for the first time in a motion for a new trial unless the misconduct is so flagrant that no instruction could have cured the prejudicial effect.' " *Collins v. Clark County Fire Dist. No. 5*, 155 Wn. App. 48, 94, 231 P.3d 1211 (2010) (quoting *Sommer v. Dep't of Soc. & Health Servs.*, 104 Wn. App. 160, 171, 15 P.3d 664 (2001)).

¶39 The Students allege that the District's counsel "committed misconduct by abusive misuse of the student victims' statement[s] of damages mandated under RCW 4.28.360. Counsel used the procedural statement[s] to suggest that [the Students were] demanding excessive damages from the District due to avarice." Appellants' Br. at 47.

### 1. Relevant Facts

¶40 Each plaintiff responded to the District's pretrial request for statements of damages identically, in the following manner:

**A. SPECIAL DAMAGES**

These figures have not been calculated with specificity at this time and are still in the process of being determined.

Supplementation will occur through expert testimony and during the course of discovery.

## B. GENERAL DAMAGES

General damages fall within the exclusive province of the jury. This is a case in which the sexual histories of young girls and boys were broadcast to the entire high school student body and surrounding community. This resulted in extreme humiliation, harassment, embarrassment, and ridicule to the plaintiffs. Juries in similar cases involving public ridicule, embarrassment, and invasion of privacy have awarded general damages in the $2 million to $4 million range. An award within this range would be appropriate in this case.

4 CP at 684-85, 687-88, 690-91, 693-94, 696-97, 699-700, 702-03, 705-06 (statements of damages) (citing several trial court orders from state and federal court).[6] Nothing in the statements identified them as settlement offers. Trial counsel signed each statement, not the student.

¶41 During opening statement, the District's counsel stated, "[W]e've had a statement of damages against the School District from these plaintiffs of between [$]16 and $32,000,000.00. This is serious, folks." 3 RP at 261. The Students' counsel did not object.

¶42 The District's counsel asked the first witness, CF, father of MLF, the following question: "Could you please turn to the second page and tell me if I read this correctly. 'Juries in similar cases involving public ridicule, embarrassment, invasion of privacy, have awarded general damages in the [$]2,000,000 to [$]4,000,000 range. An award within this range would be appropriate in this case.' Is that correct?" 3 RP at 310. CF agreed and counsel concluded cross-examination with no additional questions. The Students did not object.

¶43 On redirect, the following exchange occurred:

---

[6] One plaintiff apparently elected not to testify; therefore, her statement of damages was not admitted into evidence. It is in the record on appeal and is identical to the seven that were admitted at trial.

Q. [By the Student's Counsel:] [The District's counsel] asked you to read a couple of portions from this request for statement of damages.

A. [By CF:] Uh-huh.

Q. Did you write this?

A. I did not.

Q. The section he asked you to read from begins on the first page actually, and it's titled "general damages"; do you see that?

A. Yes, sir.

. . . .

Q. [CF], will you just read to the jury starting with that first sentence where it says "general damages"?

A. General damages fall within the exclusive province of the jury. This is a case in which the sexual histories of young girls and boys were broadcast to the entire high school student body and surrounding community. This resulting [sic] in extreme humiliation, harassment, embarrassment and ridicule to the plaintiffs. Juries in similar cases involving public ridicule, embarrassment, invasion of privacy have awarded general damages in [$]2,000,000.00 to $4,000,000.00 range. An award—

3 RP at 312-13. The District's counsel posed a similar question to each plaintiff and the Students' counsel asked many of the student's similar questions on redirect.

¶44 Either in response to the District's question or on redirect, the plaintiffs gave similar testimony: that they trusted the jury to do the right thing, were unaware of how much money they were requesting, were allowing their lawyers to handle it, and were not asking for that particular amount but merely pointing out that other juries had awarded that amount in other cases. The Students' counsel made no objections to the questioning or testimony. The subject of the statements of damages also came up in questions from the jury.

¶45 At closing, the Students' counsel addressed the statements of damages, attacking the District's portrayal of

the Students as "greedy." 13 RP at 2646. The District also addressed the statements of damages in closing, arguing that the Students had a personal interest in the outcome of the case and the jury should take that bias into account.[7]

¶46 In their motion for a new trial, the Students argued that the evidence should have been excluded under ER 402, ER 403, and ER 408, and that the District's counsel took advantage of this error and therefore committed misconduct. The trial court denied the motion.

### 2. Issue Preservation

¶47 The District first contends that the Students did not raise this issue at trial. We agree.

¶48 The Students certainly objected to the admission of the statements into evidence.[8] But, on appeal, the Students do not contest the trial court's ruling on the admissibility question. Rather, they contest the District's use of the statements during trial.[9] The Students did not bring a motion in limine on that issue, and they did not contemporaneously object to the alleged misconduct. Because the

---

[7] The District's counsel specifically challenged MKB's credibility, asking the jury whether she had brought the lawsuit to prevent the same thing from happening in the future or to collect money.

[8] The Students contend that they properly raised the issue in a motion in limine and therefore had a standing objection to the use of the statements. It is unclear to which motion the Students refer. The Students moved in limine to exclude discussion or implications regarding settlement offers under ER 408. The motion did not discuss the statements of damages. The Students also moved in limine to exclude testimony or argument regarding the District's financial ability to pay a judgment. The parties agreed to both motions and the trial court granted them. The trial court also ruled that the Students' notices of claims were inadmissible. Finally, as we discussed above, the Students objected when the District's counsel sought a pretrial ruling on the admissibility of the statements of damages.

[9] The Students do not assign error to the trial court's ruling on admissibility. Rather, the assignment of error on this issue states, "The trial court abused its discretion in permitting misuse of the student victims' statements of damages by the District's counsel." Appellants' Br. at 3. The related issue statement similarly addresses counsel misconduct: "Did the District's counsel engage in misconduct by repeatedly misrepresenting the law, confusing the court, and inflaming the passion and prejudice of the jury by arguing that the student victims had taken away the First Amendment rights of other students because of their greed?" Appellants' Br. at 4-5.

Students did not object to the conduct at the time of trial, they were not entitled to raise this issue in a motion for a new trial unless they proved that the misconduct was " 'so flagrant that no instruction could have cured the prejudicial effect.' " *Collins*, 155 Wn. App. at 94 (quoting *Sommer*, 104 Wn. App. at 171).

### 3. Flagrant Misconduct

¶49 The Students argue that the District's counsel committed misconduct by using the procedural statement to suggest that the Students were demanding excessive damages from the District due to avarice. They argue that no instruction could have cured "this insidious thread that the District wove throughout the trial." Appellants' Reply Br. at 28.

¶50 It is improper for counsel to invite the jury to decide a case based on anything other than the evidence and the law, including appeals to sympathy, prejudice, and bias. *See Adkins v. Aluminum Co. of Am.*, 110 Wn.2d 128, 142, 750 P.2d 1257, 756 P.2d 142 (1988). The Students cite *Day v. Goodwin*, 3 Wn. App. 940, 478 P.2d 774 (1970), in support of their assertion that the District's counsel committed misconduct. In that case, counsel in his closing argument advised the jury that the plaintiff's wrongful death action was an attempt to get on "easy street" and was for monetary gain in the death of a child. *Day*, 3 Wn. App. at 943. The court stated:

> Although counsel is given wide latitude in arguing the evidence to the jury, he must stay within reasonable bounds of legitimate argument. We do not approve of the arguments made and agree with the observation of the Supreme Court in *Pederson v. Dumouchel*, 72 Wn.2d 73, 84, 431 P.2d 973 (1967) that "[a] case should be argued upon the facts without an appeal to prejudice."

*Day*, 3 Wn. App. at 944. *Day* certainly suggests that such an argument, in that case, was improper, but *Day* is not helpful here. For purposes of this case, the authority the Students

cite merely proves the general rule that an appeal to the passions and prejudices of the jury rather than argument based on inferences gleaned from the evidence is improper. A frequently cited criminal[10] case on counsel misconduct is *State v. Belgarde*, 110 Wn.2d 504, 755 P.2d 174 (1988). In that case, the prosecutor made improper comparisons, calling the American Indian Movement " 'a deadly group of madmen' " and " 'butchers, that killed indiscriminately.' " *Belgarde*, 110 Wn.2d at 506-07 (emphasis omitted). The court found that these comments were "flagrant" and a "deliberate appeal to the jury's passion and prejudice." *Belgarde*, 110 Wn.2d at 507-08. No such flagrant and ill-intentioned misconduct occurred here.

¶51 First, while it is true that the documents did not relate to settlement or trial, counsel did not commit flagrant misconduct in construing the statements as pretrial demands. The statements of damages explicitly stated, "An award within this range would be appropriate in this case." 4 CP at 685, 688, 691, 694, 697, 700, 703, 706. The statute mandating statements of damages requires that "the plaintiff set[ ] forth separately the amounts of any special damages and general damages sought." RCW 4.28.360. Therefore, it is fair to interpret the amount listed in the statements as doing exactly that.

¶52 Second, the figure the District used at trial, $16 million to $32 million, was not an unfair reading of the ambiguous language of the statements of damages. The documents explicitly stated that $2 million to $4 million in damages would be appropriate. The documents also listed each plaintiff individually, thus creating confusion as to whether the amounts related to the individual plaintiffs or the group as a whole. Further, the discussion of allegedly analogous case law in the statements of damages did not

---

[10] As noted by our Supreme Court, very few Washington cases interpret the standard for counsel misconduct in the civil context. *Aluminum Co. of Am.*, 140 Wn.2d at 538. But, it is appropriate to analogize to cases in the criminal context. *See Aluminum Co. of Am.*, 140 Wn.2d at 538.

mention whether those cases involved a single plaintiff or multiple plaintiffs, giving rise to the assumption that the value suggested was for each plaintiff individually. That these ambiguities then resulted in a poor perception of the Students at trial could have well been anticipated and avoided by drafting a clear statement of damages. As the District points out, "If Plaintiffs suggest that the misconduct inhered in the mere suggestion that they really were seeking the amounts indicated in their Statements of Damages, then this makes for a strange brand of 'misconduct.'" Resp't's Br. at 52. Any confusion in the interpretation was mitigated by the fact that the statements of damages were admitted into evidence, so the jury could read them and interpret them for themselves. Finally, it is not an absurd interpretation of the statements that the Students were collectively asking for an amount greater than the $2 million to $4 million requested on their statements of damages, since the Students in fact collectively asked at trial for a high-end award of $6.8 million.

¶53 Third, the District's counsel's argument related directly to a proper consideration for the jury: the credibility of the testimony and circumstantial evidence. In the criminal context, a prosecutor is afforded wide latitude during closing argument in drawing and expressing reasonable inferences from the evidence, including commenting on the credibility of witnesses and arguing inferences about credibility based on evidence in the record. *State v. Millante*, 80 Wn. App. 237, 250, 908 P.2d 374 (1995). The same is true in the civil context. Evidence that a witness has a financial interest in the lawsuit's outcome may show bias. *Alston v. Blythe*, 88 Wn. App. 26, 41, 943 P.2d 692 (1997). That is exactly how the District's counsel used the statement of damages evidence here.

¶54 Finally, the comments in closing fairly responded to testimony presented at trial that the Students "were bringing this lawsuit so this would never happen to anybody else." 8 RP at 1373. The District was entitled to make a fair

response to the Students' case. *See, e.g., State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994) ("[T]he prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel."). Because the Students fail to show that counsel's comments were improper, let alone flagrant and ill intentioned, the Students may not raise this issue for the first time on appeal.

D.  Civil Rule 59(a)(1) and (9): Irregularity in the Proceedings and Substantial Justice

¶55  Finally, the Students assert that they are entitled to a new trial under CR 59(a)(1) and (9). Under CR 59(a)(1), a new trial may be granted if an "[i]rregularity in the proceedings of the court" prevented the aggrieved party "from having a fair trial." Further, if "substantial justice has not been done," the trial court may also grant a new trial. CR 59(a)(9).

¶56  The Students assert that "[f]alsehoods, confusion, and testimony as to conclusions of law and damages, pervaded the trial and prejudiced the outcome." Appellants' Br. at 54. As we discussed above, the District properly introduced evidence and testimony regarding the open forum teaching method at Emerald Ridge. Further, the District properly used the Students' statements of damages to demonstrate potential bias. Accordingly, we conclude that the trial court did not err when it denied the Students' motion for a new trial under CR 59(a)(1) and (9).

¶57  The Students request "[c]osts on appeal" but do not cite to the Rules of Appellate Procedure. Appellants' Br. at 55. Under RAP 14.2, we may award costs to the substantially prevailing party. Since the Students are not the substantially prevailing party, they are not entitled to costs allowed under RAP 14.2.

¶58  We affirm.

ARMSTRONG and QUINN-BRINTNALL, JJ., concur.

Review denied at 176 Wn.2d 1002 (2013).