# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| MIRIAM HALL, | No.  49150-8-II |
| Respondent/Cross Appellant, | |
| v. | UNPUBLISHED OPINION |
| VIRGINIA CARSON, | |
| Appellant/Cross Respondent. | |

BJORGEN, J. — Virginia Carson appeals from a jury verdict in favor of Miriam Hall arising out of a car accident.  She contends that the trial court erred by (1) excluding Hall's statement of damages under ER 403 and (2) refusing to instruct the jury on failure to mitigate. Hall also cross-appeals, arguing that (3) the trial court erred by awarding costs to Carson under CR 41(d).  We disagree and affirm the trial court.

## FACTS

On September 11, 2013, Virginia Carson drove into the rear of a car driven by Miriam Hall.  At the time of the accident, Hall was a licensed practical nurse (LPN) and was in the process of studying to be a registered nurse (RN).  Hall returned to work after the accident, but began experiencing headaches.  Hall suspected that her headaches were the result of whiplash caused by the car accident, and some of the other nurses at her work gave her an ice pack and anti-inflammatories.

On September 23, Hall went to Steven Lewis, a chiropractor, because she was still in pain from the car accident.  Lewis examined Hall and determined that Hall suffered a ligament injury

as a result of the car accident. Lewis further determined that Hall's injury was permanent and that her treatment would revolve around managing Hall's pain associated with that injury. Over the course of the next few years, Hall made at least 223 appointments with Lewis to treat her pain, which became worse over time.

On June 10, 2014, Hall filed her first complaint against Carson over the September 2013 accident. On June 19, 2015, the superior court granted Hall's motion to dismiss her first case pursuant to CR 41(a)(1)(B). On July 7, Carson filed a motion with a cost bill associated with the first complaint under CR 41(d). On August 14, the superior court awarded Carson $200 in statutory attorney fees and $4,700 in costs related to Carson's expert witness, Dr. Reed Wilson, under CR 35.

On June 23, 2015, Hall filed a second complaint against Carson regarding the same accident. In July Carson served Hall with a request for statement of damages pursuant to RCW 4.28.360.[1]

Carson filed a motion to compel Hall to respond to her request for a statement of damages, which the superior court granted with respect to that request. The same day, Hall provided Carson with a statement of damages that stated, "For ER 408 Settlement Purposes," and requested $100,000, Carson's maximum insurance policy limit, in general and special damages. Clerk's Papers (CP) at 216. The statement of damages further stated, "We reserve the right to

---

[1] RCW 4.28.360 states:
> In any civil action for personal injuries, the complaint shall not contain a statement of the damages sought but shall contain a prayer for damages as shall be determined. A defendant in such action may at any time request a statement from the plaintiff setting forth separately the amounts of any special damages and general damages sought. Not later than fifteen days after service of such request to the plaintiff, the plaintiff shall have served the defendant with such statement.

amend this response should circumstances change, new information come to light and/or if this matter proceeds to trial." CP at 216

Hall filed a motion in limine to exclude her statement of damages, arguing that it was inadmissible under ER 401, 402, 403, 408, 608, and 802. Hall claimed that the statement of damages was not relevant because it "was prepared by plaintiff's counsel and does not constitute proof of anything." CP at 196. She also asserted that it would cause confusion and be misused, claiming that "[t]here [was] no proper way [the statement of damages] could be used" and that "[h]ow the jury might use [it] is unpredictable." CP at 197. Hall argued that the statement of damages was a settlement negotiation, which was demonstrated by the fact that Hall did not file it like a pleading. Hall also claimed that it was inadmissible as impeachment evidence under *M.R.B. v. Puyallup School District*, 169 Wn. App. 837, 859, 282 P.3d 1124 (2012). Hall asserted further that the statement of damages was hearsay and that she had never seen it. Finally, Hall argued that admitting the statement of damages violated her right to have damages determined by the jury.

The trial court granted Hall's motion in limine to preclude any reference at trial to the amount of damages in her statement of damages under ER 403, explaining in part that it was not a statement made by plaintiff and could cause confusion.

Carson admitted liability for the accident, and the only issue at trial was the amount of damages. Hall called Lewis as a witness during trial, and the following exchange occurred:

[Counsel]: Now were you concerned about [Hall] continuing to work with the injury?

[Lewis]: Yes. . . .
And I think her record demonstrates a lot of ongoing exacerbations and not being able to get it under control very well as she tries to maintain, you know, working above the sub-labor

3

threshold, supplying for her family and her daughter, and, you know, being a viable working person.

[Counsel]: And is it fair to say that most of her exacerbations are associated with the strains of work?

[Lewis]: I'd say most of them are with work. I think that she commonly reported that sitting in class, working on the computer, also was a -- things that would exacerbate her neck, bring on more pain and headaches and things like that, too.
So both the studies that she was doing to move forward to get her RN, as well as her work duties both.

Verbatim Report of Proceedings (VRP) (Vol. IV) at 478.

Carson cross-examined Lewis regarding the number of times Hall had chiropractic treatment and the billing for those appointments:

[Counsel]: I came up, in going through your records, with 223 visits [by Hall]. Does that sound about right to you?

[Lewis]: Yeah, probably.

[Counsel]: How much do you make on each one of her visits?

[Lewis]: You know, I'm not exactly sure. We bill the standard billing codes, and I'm not sure in her particular case if there's a deduction that we take or not. I haven't really paid attention to that.

[Counsel]: You have no idea how much you charge for a spinal manipulation?

[Lewis]: Well we bill -- there's a code, a billing code. . . . And I think it's currently $81.16.

. . . .

[Counsel]: And have you recommended that you continue to treat [Hall] for the rest of her life?

[Lewis]: I have had discussions with Ms. Hall that with her clinical findings and the objective findings that she may more likely than not require ongoing supportive care.

VRP (Vol. IV) at 489.

4

Carson also cross-examined Lewis about information contained on his professional website:

[Counsel]: I want to read to you again from your website, under the topic Time Matters. It says, "When a spinal ligament has been injured, there's a short window of opportunity to begin treatment that results in the best possible outcome and the recovery from your injuries. The common approach of waiting to see if the pain goes away on its own often has disastrous results."
You're aware that Ms. Hall waited 12 days to come in and see you in this case, correct?

[Lewis]: Correct.

[Counsel]: Is that what happened here, is that she waited too long to get treatment for this ligament injury?

[Lewis]: No. . . . Ms. Hall was self treating, using ice and trying to self manage, which is appropriate to do that.
One of the things that we want to do in the beginning is use a lot of ice, control the inflammatory response, and I think she was doing the best she could on her own, and I don't think that caused any further damage.
. . . .
And in Ms. Hall's particular case I didn't see anything or did she relate anything to me that would cause further damage or delay.

VRP (Vol. IV) at 499-501.

Carson further cross-examined Lewis about the possibility of immobilization as a treatment option:

[Counsel]: Have you tried immobilization of her cervical spine to help heal her ligament injuries?

[Lewis]: No. Immobilization is really not an indicated therapy for those. What we want to do is improve the communication between the three subsystems. We want to activate the ligaments in a careful, controlled method that doesn't create more injury; we want to stimulate the nerve endings in there to communicate with the control center, the nervous system, to get the muscles to work better. And we want to try to do that as much as we can to try to keep that loop going.

And immobilization is going to prevent that whole process, it's going to shut it all down. If the neck can't move, there can be no input. There can't be anything happening with it.

VRP (Vol. IV) at 509.

Carson called Wilson to testify for the defense:

[Counsel]: What significance do you place on Dr. Lewis's findings and these records that came back from the radiologist in Wisconsin? How did you interpret that?

. . . .

[Wilson]: So in this case, the Spinal Kinetics in Wisconsin or wherever, reported finding abnormal subluxation between the second and the third cervical vertebrae in the neck. But I didn't see evidence for that. . . .
So I found no evidence of subluxation of the joints which is the basis for much of this entire case. . . .

[Counsel]: Okay. In addition to the films, you conducted a physical examination of Ms. Hall?

[Wilson]: I did.

[Counsel]: Did you find any objective evidence of injury when you did that?

[Wilson]: No.

VRP (Vol V) at 543-46.

Carson also asked Wilson whether immobilization would have been an effective treatment:

[Counsel]: . . . . Have you seen immobilization of the cervical spine used to treat a serious ligament injury?

[Wilson]: Sure. Tissues can heal, muscle strains can heal, tendons, ligament injuries can heal. . . . If they had a ligamentous injury in their neck you might give them a hard collar to wear for a while until that ligament heals up.
Or if the ligament injury is very severe and persisted after you took them out of a hard collar, you might want to ask a neurosurgeon to tighten the ligaments or fuse the bone so there wouldn't -- so it wouldn't be a catastrophic result from movement.

6

[Counsel]: And if you had a patient who you believed had a ligament injury, would you recommend that they undergo several spinal manipulations by a chiropractor?

[Wilson]: No. Unless – common sense tells you if there's ligamentous injury, avoidance of movement is proper. You don't want to put the patient at risk for damage from stretching the ligament. It's already over stretched. You want to give it a rest. So I would think manipulation would be the opposite treatment of what you'd really want to do if you suspected somebody had a ligamentous injury.

VRP (Vol. V) at 550-51.

Hall cross-examined Wilson regarding his medical analysis:

[Counsel]: And to fix the problem in [Hall's] neck?

[Wilson]: Well I'm not sure there is an ongoing problem. I thought [Hall] had a mild cervical strain, which is resolved. And that if she had a ligamentous injury, then the treatment would not be the fix. There may be no fix because ligamentous injuries can fail to heal and leave ongoing problems. But if it's -- there are two types of treatment. One if there's sufficient laxity to endanger the spinal cord, surgery would be the answer. If not, then just avoidance of those extreme motions that would aggravate the problem.

VRP (Vol. V) at 561.

Hall testified at trial about her decision to seek treatment. She stated that she asked doctors and other medical professionals with whom she worked about possible treatment options and that she did not want to pursue spinal surgery or injections to manage pain. Hall did not want to use prescription medication to manage pain because those drugs would interfere with her ability to work as a nurse. Hall explained that Lewis's treatments were helping her with pain management and that she continued to see Lewis because he helped her effectively manage her pain. Hall also testified that none of the friends she spoke with regarding her injury

recommended immobilization as a treatment and that immobilization was a practice that the

medical profession did not recommended anymore.

Prior to closing argument, the trial court rejected Carson's request to instruct the jury on

failure to mitigate, explaining:

> And basically when I read the cases I do think there was insufficient evidence to present to the jury the question on failure to mitigate. You know what, [Lewis's] web page really isn't evidence in this case, although he was asked about it and tied it somewhat to this case. But overall Dr. Lewis just talked about [it] in general, not sufficient on this case.
>
> So I can't find there was an unreasonable -- and that [is] what the case law talks about, unreasonable failure to mitigate. She has worked around the medical field herself, she's an LPN studying most of the way to an RN, spoke with her mom, who's an ICU [(intensive care unit)] and ED [(emergency department)] RN. She was around medical staff, they did some treatment to her. So I couldn't find there was sufficient evidence on a failure to mitigate.

VRP (Vol. VI) at 646-47.

In closing, Hall asked the jury for a verdict of $1,445,000. During Carson's closing,

counsel in part argued:

> I've never used the word fraud, I've never used the word that Ms. Hall is a cheat, I've never said she's a liar. Okay? I told you in opening statement I don't know if she's injured. You don't know if she's injured. Mr. Robison thinks he knows she's injured. But the only person that knows whether or not she's injured is Ms. Hall. And she's suing my client for almost a million and a half dollars. So it's my job to go out and find the best medical expert I can because she's been a captive patient of a chiropractor for 220-some visits.
> . . . .
> I told you in opening statement that this was going to be a medical dispute. On one hand we have Dr. Lewis, who's already profited substantially from treating [Hall] 223 times. He's got a captive patient. He won't refer her out for an MRI [(magnetic resonance imaging)] scan, he won't refer her out to another doctor. Because in his words he's afraid that an MD [(medical doctor)] might not understand this ligament injury that he's diagnosed [Hall] with.

VRP (Vol. VI) at 682-83.

8

The jury found that Carson's negligence had injured Hall and that Hall's damages were $348,000. The trial court entered findings of fact and conclusions of law and the judgment against Carson, but also awarded Carson costs related to Hall's first lawsuit. Carson appealed the judgment, and Hall cross-appealed the trial court's award of costs to Carson.

ANALYSIS

I. STATEMENT OF DAMAGES

Carson argues that the trial court erred by excluding Hall's statement of damages. Specifically, Carson argues that the trial court erred by finding that the statement of damages is a statement made by plaintiff and that the trial court abused its discretion by finding that it could confuse the jury.

We review the trial court's interpretation of statutes and evidentiary rules de novo. *Diaz v. State*, 175 Wn.2d 457, 462, 285 P.3d 873 (2012). We review a trial court's decision to admit or exclude evidence, including whether to grant a motion in limine[2] for an abuse of discretion. *Diaz*, 175 Wn.2d at 462; *Hizey v. Carpenter*, 119 Wn.2d 251, 268, 830 P.2d 646 (1992).

> A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds or reasons. A trial court's decision is manifestly unreasonable if it adopts a view that no reasonable person would take. A decision is based on untenable grounds or for untenable reasons if the trial court applies the wrong legal standard or relies on unsupported facts.

*Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 668-69, 230 P.3d 583 (2010) (internal quotation marks and citations omitted). We will not find an abuse of discretion "simply because [we]

---

[2] Where evidentiary rulings are made in response to a motion in limine, the losing party generally has a standing objection, unless the trial court indicates that further objections are required. *Garcia v. Providence Med. Ctr.*, 60 Wn. App. 635, 641, 806 P.2d 766 (1991); *see Millican v. N.A. Degerstrom, Inc.*, 177 Wn. App. 881, 889, 313 P.3d 1215 (2013).

would have decided the case differently." *Gilmore v. Jefferson County Pub. Transp. Benefit Area*, 190 Wn.2d 483, 494, 415 P.3d 212 (2018).

A.      Statement by the Plaintiff

The trial court found that statements of damages "are commonly prepared by counsel without any assistance from their client; as is the case here. It's procedural in nature. This is not really an out of court statement of a party." CP at 403. In other words, the trial court found that because counsel prepared the plaintiff's statement and provided it to the defendant to comply with the statutory requirement that the plaintiff provide the defendant with a statement of damages, the statement was not made by the plaintiff, and therefore was inadmissible.

Our fundamental objective in statutory interpretation is to give effect to the legislature's intent. *Wells Fargo Bank, N.A. v. Dep't of Revenue*, 166 Wn. App. 342, 350, 271 P.3d 268 (2012). If a statute's meaning is plain on its face, then we give effect to that plain meaning as an expression of legislative intent. *Id.* We discern plain meaning not only from the provision in question but also from closely related statutes and the underlying legislative purpose. *Id.* Although we consider statutes in the context of related statutes, we do not add words to statutes that the legislature has not included. *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). We do not interpret a statute such that it renders any portion meaningless or superfluous. *Jongeward v. BNSF R. Co.*, 174 Wn.2d 586, 601, 278 P.3d 157 (2012).

RCW 4.28.360 states:

In any civil action for personal injuries, the complaint shall not contain a statement of the damages sought but shall contain a prayer for damages as shall be determined. A defendant in such action may at any time request a statement from the plaintiff setting forth separately the amounts of any special damages and general damages sought. Not later than fifteen days after service of such request to the plaintiff, the plaintiff shall have served the defendant with such statement.

10

The plain language of RCW 4.28.360 requires the plaintiff to provide the defendant with a statement of damages. The statute authorizes the defendant to request the statement "from the plaintiff" and requires in response that "the plaintiff" set forth separately the amounts of any special damages and general damages sought. RCW 4.28.360. Therefore, "it is fair to interpret the amount listed in the statements as doing exactly that." *M.R.B.*, 169 Wn. App. at 859.

Generally, where a party is represented by counsel in a lawsuit, the party acts through her attorney, and her attorney's actions are binding on the client. *Haller v. Wallis*, 89 Wn.2d 539, 547, 573 P.2d 1302 (1978); *Russell v. Maas*, 166 Wn. App. 885, 889-90, 272 P.3d 273 (2012); *Clay v. Portik*, 84 Wn. App. 553, 561, 929 P.2d 1132 (1997). Hall's attorney was acting on her behalf in responding to the defendant's request for statement of damages. For these reasons, the trial court erred in determining that the statement of damages was not a statement made by the plaintiff because her attorney prepared it.

B.     Juror Confusion

Carson contends that the trial court abused its discretion by determining that the statement of damages was inadmissible because it would potentially confuse the jury. We disagree. Regardless of the trial court's error in determining that the statement of damages was not a statement by the plaintiff, the trial court did not abuse its discretion in excluding the statement of damages to avoid possible juror confusion.

Relevant evidence may be excluded if its probative value is substantially outweighed by the risk of confusing the issues. ER 403. While we agree that the statement of damages may be relevant to show bias, Carson has failed to demonstrate that the trial court abused its discretion. *See M.R.B.*, 169 Wn. App. at 860. The relatively low figure in the statement of damages, not intended as a final amount of claimed damages, could unduly lead the jury to scepticism of the

11

final amount. Although one could also reasonably reach the opposite conclusion, it was not unreasonable for the trial court to determine that the possibility of confusing the jury with distracting issues outweighed any probative value that the statement of damages carried. Therefore, the trial court did not abuse its discretion in excluding the statement of damages.

## II. INSTRUCTION ON FAILURE TO MITIGATE

Carson argues that the trial court erred by refusing to instruct the jury on failure to mitigate. Specifically, Carson maintains that she presented substantial evidence of Hall's failure to mitigate, entitling her to a jury instruction on failure to mitigate. We disagree.

### A. Preservation of Carson's Challenge

Hall asserts that Carson has not preserved this issue for review.

One challenging the trial court's failure to give a jury instruction must have proposed the instruction in the trial court. *Gorman v. Pierce County*, 176 Wn. App. 63, 86, 307 P.3d 795 (2013). CR 51(d)(2) states that where the refusal to give a requested instruction is challenged, "a copy of the requested instruction shall be placed in the record on review." In general, "a party requesting an instruction that appears in the Washington pattern instructions must propose the instruction in writing." *Gorman*, 176 Wn. App. at 86. However, "a party may request a Washington pattern instruction simply by referring to the instruction's published number if the superior court has adopted a local rule permitting that procedure." *Id.* at 86-87. Hall states that Clark County Superior Court has no such rule.

The trial record shows that Carson submitted a proposed written instruction modeled on 6 *Washington Practice, Washington Pattern Jury Instructions: Civil* 33.01 (6th ed. 2017) (WPI), the failure to mitigate instruction, but the proposed instruction has not been included in the record on appeal. CR 1 states that the civil rules "shall be construed and administered to secure

12

the just, speedy, and inexpensive determination of every action." Carson submitted her proposed instruction in writing and it was modeled on a WPI instruction. Even without the instruction itself in the record, this gives us sufficient information to make a principled decision of Carson's challenge. Avoiding this issue because a copy of the instruction was not included in the record on review serves no purpose and ignores the injunction of CR 1. Therefore, we reach this issue.

B.      Legal Principles

Generally, whether to give a particular instruction is within the trial court's discretion. *Taylor v. Intuitive Surgical, Inc.*, 187 Wn.2d 743, 767, 389 P.3d 517 (2017). We review the trial court's refusal to give a requested jury instruction for an abuse of discretion if the decision is based on an issue of fact, and de novo if the decision is based on an issue of law. *Id.*

Trial courts are required to instruct the jury on a party's theory of the case where substantial evidence supports the theory. *Id.* "To determine whether to give an instruction, the trial judge 'must merely decide whether the record contains the kind of facts to which the doctrine applies.'" *Id.* (quoting *Kappelman v. Lutz*, 167 Wn.2d 1, 6, 217 P.3d 286 (2009)). In determining whether substantial evidence supports the requested instruction, we consider the evidence in the light most favorable to the requesting party. *Mina v. Boise Cascade Corp.*, 37 Wn. App. 445, 448, 681 P.2d 880 (1984).

More specifically, a defendant who seeks a failure to mitigate a jury instruction "must show that there were alternative treatment options available to the plaintiff and that the plaintiff acted unreasonably in deciding on treatment." *Fox v. Evans*, 127 Wn. App. 300, 305, 111 P.3d 267 (2005). Expert testimony must establish that the alternative treatment would more likely than not improve or cure the plaintiff's condition. *Id.* at 308. A plaintiff is not unreasonable for refusing treatment that offers only a possibility of relief. *Id.* at 305 n.2.

13

C.      Substantial Evidence

         1. Failure to Seek Treatment

Carson suggests that Hall's failure to seek treatment for 12 days after the accident shows that she unreasonably failed to mitigate her injury. However, Hall testified that she began self-treating the injury on the day the accident occurred, and Lewis testified that the 12-day delay did not contribute to Hall's injury. Carson has not demonstrated that Hall failed to timely seek medical treatment or unreasonably delayed seeking treatment. Accordingly, Carson has not demonstrated that she was entitled to a failure to mitigate instruction on the basis of failure to seek timely medical treatment.

         2. Chiropractic Visits

Carson also contends that Hall acted unreasonably by relying exclusively on chiropractic treatment, even after her injury became worse. Hall testified that Lewis's treatments were helping her with pain management and that she continued to see Lewis because he helped her effectively manage her pain. Further, Hall testified that she spoke with several colleagues in the medical field regarding how to best treat her injury. She also testified that she did not want to use prescription drugs because they would interfere with her ability to be a nurse, that she did not want to undergo surgery, and that injections for pain management had a low success rate.

Expert testimony did not establish that treatment by a medical doctor would more likely than not improve or cure Hall's condition. Wilson testified that "[t]here may be no fix because ligamentous injuries can fail to heal and leave ongoing problems." VRP (Vol. V) at 561. Even taking the evidence in the light most favorable to Carson, Hall was presented with two conflicting treatment options, neither presenting a certain cure. Carson has not demonstrated that Hall's choice to pursue chiropractic treatments was unreasonable. Accordingly, Carson has not

14

demonstrated that she was entitled to a failure to mitigate instruction on the basis of Hall's pursuing chiropractic treatments.

    3. Immobilization

Carson argues that Hall acted unreasonably by not seeking treatment by a medical doctor or attempting immobilization as an alternative treatment. Hall testified that immobilization was no longer a recommended treatment in the medical field. Hall also testified that Lewis's treatments were helping her with pain management and that she continued to see Lewis because he helped her effectively manage her pain. Additionally, Wilson testified that "[t]here may be no fix because ligamentous injuries can fail to heal and leave ongoing problems." VRP (Vol. V) at 561. Therefore, the record shows that Hall's decision not to pursue immobilization was informed and reasonable. She simply chose to pursue one of two reasonable courses of treatment. Under the authority above, that is not a sufficient basis for an instruction on failure to mitigate.

Carson fails to demonstrate that the trial court erred by not instructing the jury on Hall's failure to mitigate.

### III. CROSS APPEAL—COSTS REGARDING DISMISSED CASE

Hall argues that the trial court erred by awarding costs to Carson pursuant to CR 41 after she voluntarily dismissed her 2014 case. We hold the trial court did not err.

We review the trial court's interpretation of cost provisions and the application of court rules to particular facts de novo. *Johnson v. Horizon Fisheries, LLC*, 148 Wn. App. 628, 633, 201 P.3d 346 (2009). We construe court rules in the same manner as statutes. *State v. Walker*, 101 Wn. App. 1, 7, 999 P.2d 1296 (2000).

Hall argues that Carson's request for fees was untimely because it was made after the deadline in CR 54(d)(1). CR 54(d)(1) states in part, "If the party to whom costs are awarded does not file a cost bill or an affidavit detailing disbursements within 10 days after the entry of judgment, the clerk shall tax costs and disbursements pursuant to CR 78(e)." However, there was no judgment in the 2014 case because Hall voluntarily dismissed her case. Hall's argument fails because in the absence of a judgment, the deadline in CR 54(d)(1) does not take effect.

Hall also maintains that the trial court erred by awarding medical examination and witness expenses to Carson because those expenses are not authorized by RCW 4.84.010. Based on *Johnson*, Hall's argument fails because the cost provision in CR 41(d) is not limited to the definition of costs in RCW 4.84.010.

In Washington, a party may recover litigation costs only when authorized by statute, rule, or case law. *Johnson*, 148 Wn. App. at 633. CR 41(d) states:

> If a plaintiff who has once dismissed an action in any court commences an action based upon or including the same claim against the same defendant, the court may make such order for the payment of taxable costs of the action previously dismissed as it may deem proper and may stay the proceedings in the action until the plaintiff has complied with the order.

*Johnson* held that the reference to "taxable costs" in CR 41(d) was not limited to the costs enumerated under RCW 4.84.010. *Id.* at 634. The court reasoned that unlike CR 54(d), which expressly incorporates chapter 4.84 RCW, CR 41(d) did not include any statutory restrictions on the meaning of costs. *Id*. The court also explained that RCW 4.84.010 would not apply to CR 41(d) because the rule authorized expanded costs recovery "'as [the court] may deem proper.'" *Id.* (quoting CR 41(d)). The court further reasoned that the holding in *Polygon Northwest Co. v. American National Fire Insurance Co.* did not mean that "taxable costs" always refers to RCW 4.84.010, only that the term excluded nonstatutory attorney fees. *Id*. at 635; *Polygon Nw. Co. v.*

*Am. Nat'l Fire Ins. Co.*, 143 Wn. App. 753, 189 P.3d 777 (2008). The court affirmed the trial court's award of costs, which included costs for a medical evaluation under CR 35. *Johnson*, 148 Wn. App. at 632, 636.

Because the cost provision in CR 41(d) is not limited to the definition of costs in RCW 4.84.010, Hall's argument fails.

Hall argues also that Carson may not recover fees for a medical examination by Wilson, because the examination was not repeated in the second proceeding and Carson received value for it by presenting its results to the jury. Although we see the logic in Hall's position, CR 41(d) authorizes the recovery of taxable costs without this limitation. Therefore, Hall's argument fails.

Next, Hall argues that Carson may not recover fees under CR 41(d) because she dismissed her 2014 case after trial had begun. Both parties agree that trial had begun when Hall dismissed her 2014 case.

In *Johnson*, Division One of our court stated that CR 41(d) applies only where the plaintiff dismissed and refiled the action *before trial*. 148 Wn. App. at 636. The court did not offer any additional explanation for this limitation, which is not clearly reflected in the language of CR 41(d). Rather, the limitation appears to be a contrast to the court's earlier observation that "RCW 4.84.010(5) and (7) allow recovery for expenses related to evidence *used at trial* by a prevailing party." *Id*.

Under CR 41(a)(1)(B), the trial court is required to grant a plaintiff's motion for a voluntary dismissal "at any time before plaintiff rests at the conclusion of plaintiff's opening case." We discern plain meaning not only from the provision in question but also from closely related statutes and the underlying legislative purpose. *Wells Fargo*, 166 Wn. App. at 350. Therefore, we diverge from Division One's holding in *Johnson*, and determine that CR 41(d)

applies in circumstances where the plaintiff has acquired a voluntary dismissal under CR 41(a)(1)(B). The trial court did not err in awarding costs to Carson under CR 41(d).

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Bjorgen, J.

We concur:

Sutton, J.

Haan, J.P.T.