# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MICHAEL GILMORE, a single man, | No. 48018-2-II |
| Respondent, | |
| v. | |
| JEFFERSON COUNTY PUBLIC TRANSPORTATION BENEFIT AREA, dba Jefferson Authority, a municipal corporation,, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Jefferson County Public Transportation Benefit Area (Jefferson Transit) appeals the jury verdict awarding Michael Gilmore $1.2 million in general damages and the trial court's denial of Jefferson Transit's motion for new trial. We conclude that the trial court's exclusion of Jefferson Transit's expert witness's testimony constituted reversible error. Because some issues are likely to arise on retrial, we address them. We conclude that Gilmore's expert witness's testimony did not exceed the scope of his expertise, the trial court improperly excluded evidence about Gilmore receiving Department of Labor and Industries (L&I) payments, and that Gilmore's lawyer made improper and prejudicial comments in closing argument. We reverse and remand.

## FACTS

On March 31, 2008, Gilmore drove his employer's van. While stopped at a stop light, a transit bus owned by Jefferson Transit either followed Gilmore's van too closely, failed to stop, and rear-ended Gilmore; or it stopped, idled forward several feet, and bumped into Gilmore's van.

The vehicles had minimal damage. Gilmore's employer did not bring a claim against Jefferson Transit for any damage to its van.

As a result of the accident, Gilmore received monthly L&I payments in the form of wage and time loss. He subsequently received a $40,000 lump sum permanent partial disability payment.

Gilmore described the collision as a "heavy duty jolt" that felt "devastating." 5 Report of Proceedings (RP) at 748-49. He went to the emergency room immediately following the collision complaining of nausea, headache, and pain in his hips, lower back, and neck. He returned to the emergency room several days later complaining of headaches and numbness in his hands. An examination showed that he had bulging discs.

At the time of the collision, Gilmore was receiving compensation from the Department of Veterans Affairs (VA). Since 2004, Gilmore had a 60 percent disability rating based on an evaluation of a number of conditions, including numbness in his hands and degenerative arthritis in his hips, elbows, knees, and spine. In 2007, he also sought care for neck pain. When Gilmore consulted with physicians in the months following the collision, he failed to tell them that he had experienced similar symptoms in the past.

Approximately one month after the collision, Dr. Marc Suffis, one of Gilmore's treating physicians, conducted an initial medical assessment on Gilmore. Suffis did not have records of Gilmore's medical history on file and relied on Gilmore to provide accurate information. Gilmore complained of numbness in his hands, headaches, and pain in his back and neck. Suffis opined that, due to the accident, Gilmore sustained a cervical or neck injury. A subsequent magnetic resonance imaging (MRI) showed disc herniation and lumbar strain.

Approximately three months after the collision, Jefferson Transit's private investigator took video surveillance of Gilmore engaging in physical activities. The video showed Gilmore jogging across the street, putting a boat on a trailer with his son, and moving his head and neck with a full range of motion.

Gilmore received a carpal tunnel syndrome diagnosis, unrelated to the accident, and had surgery on both hands in July and September 2008. At that time, he was also receiving lumbar injections, chiropractic care, and physical therapy for his neck. While healing from carpal tunnel surgery, he still had some neck pain.

In January 2009, Gilmore opened his own plumbing business, but shortly thereafter began feeling significant pain in his neck. One of his treating physicians recommended surgery, but Gilmore declined it because he would not be able to support his family if he closed his business. The physician prescribed opiates so he could work. In 2010, his treating physician again recommended surgery, but Gilmore stated that he could not afford it.

In August 2010, Gilmore sued Jefferson Transit. Jefferson Transit admitted liability for the collision, but denied causing the injuries and denied the nature and extent of the injuries. The ensuing trial solely determined the amount of Gilmore's general damages.

From 2010 to 2015, Gilmore continued to work but his sons helped with heavier jobs. He had neck surgery in 2015, but still had some headaches and lumbar pain. Gilmore eventually shut down his plumbing business.

I.    MOTIONS IN LIMINE

A.    Golden Rule Arguments

Pretrial, Jefferson Transit moved to exclude golden rule arguments that encouraged jurors to put themselves in Gilmore's place when deciding the case. Gilmore did not object and the court granted the motion.

B.    Other Income

Gilmore moved to exclude evidence of benefits from collateral sources, including L&I payments and VA disability compensation. The court denied Gilmore's motion, ruling that the collateral source rule did not apply to the payments in this case. Gilmore also moved to exclude evidence of his past and current financial status. The court granted Gilmore's motion to exclude the evidence, stating that it would not conflict with its ruling on the L&I and VA payments.

Gilmore filed a motion for reconsideration regarding the L&I and VA payments. As to the L&I payments, Gilmore argued that even if the evidence was relevant, it was too prejudicial to be used to impeach. Jefferson Transit argued that because Gilmore was being untruthful to his treating doctors regarding past symptoms, the evidence could prove he tried to commit fraud. It only intended to admit the $40,000 lump sum payment he received around the same time he opened his plumbing business. Because Gilmore was not requesting reimbursement for medical damages or loss of future earnings, Jefferson Transit argued, the evidence was not prejudicial.

The court reversed its previous ruling, stating that the L&I lump sum payment was a collateral source related to the injury. It found the evidence was more prejudicial than probative, but ruled that the evidence could come in if the door was opened at trial. It affirmed its ruling as to the VA payments.

C.      Character Evidence

Gilmore also moved to admit character evidence of his reputation in the community for truthfulness, work ethic, and honesty.  Jefferson Transit did not object, stating that Gilmore was entitled to the evidence if presented in proper form.  The court ruled that evidence in compliance with ER 608 would be admissible.

D.      Expert Witness Testimony

1.      Dr. Geoff Masci

Gilmore moved to admit Masci's testimony.  Masci, a chiropractor Gilmore retained, conducted a records review and a physical examination of Gilmore.  His report included his opinion that Gilmore had a herniated disc in his neck due to the collision.  In his motion, Gilmore admitted that he did not timely disclose Masci's report because of an "administrative oversight," but offered to make him available for deposition.  1 RP at 29.

Jefferson Transit moved to exclude the testimony because Gilmore failed to supplement its interrogatories when Gilmore received Masci's report which he completed in 2013.  It did not receive the report until weeks before trial and it did not want to depose Masci.  After reviewing the *Burnet*[1] factors, the court granted Gilmore's motion.  It reasoned that nobody suggested a lesser sanction, the discovery violation did not appear to be willful or deliberate, and Masci's testimony did not substantially prejudice Jefferson Transit, and Jefferson Transit chose not to depose Masci after being given the opportunity.

2.      Dr. Frank Marinkovich

Jefferson Transit moved to exclude Marinkovich's testimony, arguing that his opinion was speculative.  Marinkovich, an expert Gilmore retained, conducted a review of Gilmore's medical

---

[1] *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 933 P.2d 1036 (1997).

records, but did not meet or physically examine Gilmore. In his May 2015 report, Marinkovich opined that Gilmore sustained a "very serious" two-level disc injury in his neck as a result of the collision, which led to Gilmore's neck surgery. 5 RP at 650.

Marinkovich's record review, however, showed that he did not receive or review Suffis' 2004 disability assessment, Suffis's deposition testimony, or the surveillance video even though Gilmore disclosed that the additional records were made available to Marinkovich. After reviewing the *Burnet* factors, the court denied the motion because exclusion of evidence was an extraordinary remedy that it was not inclined to order as to Marinkovich's testimony.

### 3. Allen Tencer, Ph.D.

Gilmore moved to exclude Tencer's testimony. Tencer, an expert Jefferson Transit retained, had a Ph.D. in Mechanical Engineering. He performed research and published peer reviewed literature in the field of biomechanics related to injury prevention. He also taught orthopedic residents and engineering graduate students. He intended to testify to the severity of the impact and the forces produced on Gilmore during the collision.

In arriving at his opinion, Tencer relied on the weights of the vehicles involved in the collision, determined the speed of the striking vehicle based on the level of damage, and considered other factors such as head restraint design. He calculated the forces operating on Gilmore "based on fundamental engineering principles such as the conservation of energy, momentum, and restitution." Clerk's Papers (CP) at 366. He did not have a medical opinion whether Gilmore sustained injuries; however, he believed his testimony would assist the jury in understanding and assessing the differing opinions offered at trial. He previously testified in several Washington cases where courts found impact severity in car collisions to be relevant and helpful for the jury.

Gilmore argued that Tencer's testimony did not provide a medical opinion and would confuse the jury. Jefferson Transit argued that there existed conflicting deposition testimony regarding the impact of the collision, and Tencer's testimony would assist the jury in determining whether or not the accident was, as Gilmore described it, "devastating." 1 RP at 36. The court granted Gilmore's motion. It found that Tencer's testimony "makes a number of assumptions, some of which are based on facts that are not going to be in evidence." 1 RP at 39. The testimony was "intended to create an inference with some aura of authority" that was unreasonable and unjustified, and would confuse and mislead the jury. 1 RP at 39.

II.   TRIAL

A.      Dr. Suffis's Testimony

The trial court admitted Suffis's video deposition and the surveillance footage of Gilmore, and the jury reviewed both. Suffis testified regarding his medical examination of Gilmore and his opinion that Gilmore sustained a neck injury due to the collision. In August 2009, Gilmore did not want further treatment and wanted his claim closed.

Suffis later learned that during the initial assessment, Gilmore did not disclose that he had prior symptoms or that he had a 60 percent VA disability rating. Nor did he disclose that he previously sought care for neck pain in 2007. Suffis had no records on file of Gilmore's medical history and relied on Gilmore to give accurate information; Suffis, therefore, believed that the information he relied on for his diagnosis was inaccurate.

B.      Dr. Masci's Testimony

Masci testified that he physically examined Gilmore and reviewed his medical records, but relied primarily on Gilmore's recitation of his medical history and what happened at the accident.

7

Gilmore told him that the impact threw him forward and back within the confines of his seatbelt while his vehicle was stopped.

Masci opined that Gilmore had cervical subluxation, cervical degenerative disc disease and degenerative joint disease, muscle inflammation, and a cervical disc herniation related to the collision. He opined that because of Gilmore's preexisting disc degeneration, the disc herniation was severe. While he noted that Gilmore was a "less than stellar historian" as to his medical history, it did not change his opinion. 3 RP at 333.

When Masci recalled that Gilmore was not fully alert during the exam and was vague about matters because he was using pain medication, Jefferson Transit objected. The court sustained the objection. When asked whether he thought Gilmore was trying to exaggerate his symptoms, Masci stated that while there were some omissions and discrepancies between the record and what Gilmore told him, it was "actually quite common in this type of situation." 3 RP at 336-37. Jefferson Transit objected to the commentary, and the court sustained the objection.

As Masci explained how to differentiate where nerves were being pinched, Jefferson County objected, arguing that Masci was testifying outside the scope of his chiropractic expertise. The court overruled the objection. Masci explained that he had training to diagnose neurological conditions for referrals.

When Masci began to explain how Gilmore's carpal tunnel syndrome complicated the neck injury, Jefferson Transit again objected, arguing that he was talking about neurological issues and that he was not qualified to treat carpal tunnel syndrome. The court sustained the objection. When asked about deficits in the distribution of nerves as it was related to shoulder pain, Jefferson Transit again objected as to the testimony's scope. The court overruled the objection.

C.     Dr. Marinkovich's Testimony

When Marinkovich testified that his records review included the 2004 VA assessment, Jefferson Transit objected.  Outside the presence of the jury, Jefferson Transit argued that Marinkovich's report was received four weeks before trial and nowhere in his report did he mention the 2004 VA assessment.  Marinkovich also represented that he reviewed the surveillance video, but his report did not indicate that he did.

Marinkovich stated that he was asked to conduct a records review in December 2014.  He explained that in May 2015, additional records including the 2004 VA assessment were supplied to him and he reviewed them.  His undated report was written after he received the full set of records, around May 19, 2015.  Jefferson Transit stated that it received the report on May 8, 2015 and the records review on May 11, 2015.  If Marinkovich received the additional records on May 19, 2015, he could not have reviewed the additional information when he wrote his report.

Marinkovich explained he was unsure May 19, 2015 was the actual date and did not know why his report was undated.  The court stated that the issue was addressed in the parties' motions in limine and nothing it heard at trial contradicted it.  However, it acknowledged that the situation did not make sense given that he "unequivocally said . . . that he received" the additional records, but the report was written after they were received.  3 RP at 424-25.

The court declined to exclude Marinkovich's testimony.  However, it gave Jefferson Transit additional time to prepare for cross-examination.  When Gilmore asked why there needed to be a remedy, the court stated:

> [I]t's a remedy for what appears to be a lot of fishy business and potentially fishy business and deception that's been going on … I was going to allow this witness to testify even though his report was late.  Then, it turns out—and [Jefferson Transit] thought that his report was not based on Dr. Suffis' VA exam and not based on the video . . . [I]t was suggested that . . . he had everything, including these depositions.  Well, now he's saying that he did not . . . listen to or read the . . . deposition of Dr.

9

Suffis . . . [N]one of this appears to me to be very forthcoming to me is what it appears. . . . I want to give [Jefferson Transit] an adequate time to figure out exactly what the doctor did review and an adequate time now to formulate his questioning of the doctor.

3 RP at 432-33.

The trial court directed Gilmore to send copies to Jefferson Transit of everything Marinkovich reviewed before he resumed his testimony. The parties agreed that Gilmore would provide the documents to Jefferson Transit by the end of the week.

When Marinkovich resumed his testimony the following week, he testified that although Gilmore did not provide his treating doctors with an accurate medical history, it was not "false information" because Gilmore's account of his history was subjective and based on memory. 5 RP at 732. Marinkovich opined that Gilmore sustained a neck injury as a result of the collision which led to surgery.

D.      Dr. Barbra Jessen's Testimony

Jessen, a neurologist retained by Jefferson Transit, evaluated and interviewed Gilmore in December 2012 and reviewed his medical records. As part of her records review, she reviewed Gilmore's deposition and the 2004 VA disability assessment. She opined that the injuries at issue manifested in early 2009 and were not related to the collision.

E.      Character & Financial Status Evidence

In opening argument, Gilmore's lawyer stated that the only major issue was whether Gilmore was "a liar, a cheat, and a fraud." 3 RP at 273. She stated that Jefferson Transit, after admitting it caused the collision, "[came] up with a plan" to say "[Gilmore] is a liar, a cheat and a

10

fraud" and hired a private investigator to hide and videotape him. 3 RP at 274. Jefferson Transit's lawyer argued that it was not calling Gilmore a liar, cheat, or a fraud.[2]

Gilmore's first witness testified on direct examination that Gilmore "seemed liked a reasonably good guy and [they] got along great." 3 RP at 299. The court sustained Jefferson Transit's objection on the basis that the testimony consisted of inadmissible character evidence. Jefferson Transit later objected for relevance when Gilmore asked the witness whether he worried about having Gilmore come to his house to fix plumbing issues if he was not at home. Gilmore argued that Jefferson Transit opened the door to Gilmore's character of being "a liar, a cheat and a fraud." 3 RP at 305. The court sustained the objection and ruled that Jefferson Transit did not open the door. Another witness testified on direct examination that Gilmore was the hardest worker he had known. The court again sustained Jefferson Transit's objection.

One of Gilmore's sons testified, stating that Gilmore worked three jobs to keep food on the table, and that after the accident "things, kind of, hit the fan." 4 RP at 508. Outside the presence of the jury, Jefferson Transit argued that Gilmore opened the door to admitting the L&I payments. Jefferson Transit argued that Gilmore's lawyer asked Gilmore's son about his father's job, how they felt about losing money and his father's inability to work, and how it caused stress on the family. It argued that the jury should know Gilmore was receiving payments from L&I and that he received a $40,000 lump sum after the accident. Gilmore argued that the lump sum was received months after Gilmore opened his business and the payments fell within the collateral source rule. The court did not change its previous ruling.

---

[2] Gilmore does not cite to any part of the record to support its position that Jefferson Transit made these statements. Our review of the record does not indicate that Jefferson Transit ever called Gilmore a liar, cheat or a fraud before the jury.

Another one of Gilmore's sons testified that Gilmore worked multiple jobs to support the family, and that being unable to work after the accident led to his depression and alcohol addiction. Jefferson Transit objected and argued that per the court's order, Gilmore could not mention his financial status. Jefferson Transit also argued that the testimony about Gilmore's financial difficulty after the collision opened the door to questioning regarding the L&I payments. It argued the testimony was a ploy to gain the jury's sympathy, the implication being that the family had no income during this time. Gilmore argued that the testimony went to his mental pain and suffering as a result of the accident, not to sources of income. The court overruled the objection, absent it receiving authority on opening the door as to the collateral source rule.

F.    Closing Arguments

Gilmore's lawyer opened her closing argument by stating that the "issue is whether [Gilmore] is a liar, a cheat and a fraud." 7 RP at 977. She argued that Jefferson Transit "set the tone for how they were going to proceed" early on in the case about "what they were willing to do" to "cover up" their liability. 7 RP at 982-83, 985. She argued that Jefferson Transit was trying to perpetrate fraud and was attempting to escape liability by confusing the jury. Gilmore's lawyer also stated:

> Do we let the government win? Do we just roll over because we know that this is how they're gonna fight? . . . [Gilmore] can't fight the government alone. . . . We certainly can't fight the government in this case without you.

7 RP at 989, 991, 996.

Gilmore's lawyer proceeded to analogize Gilmore's condition and current situation to a job advertisement, asking the jury what it would take for them to respond to the ad:

> How much is that worth? If we saw this job ad, what would we think? . . . What's it worth in our community? . . . Maybe for that amount of money, I'd respond to that ad.

12

7 RP at 1003-04.

Jefferson Transit's lawyer began his closing argument by analogizing wrongful police shootings caught on video to the case because the surveillance footage of Gilmore "brought to light things that we wouldn't have known otherwise." 7 RP at 1006. He clarified that he never called Gilmore a liar, cheat or a fraud; the only person calling him that was Gilmore's own lawyer. Jefferson Transit's lawyer further argued that a $1.8 million verdict was "ridiculous," stating, "[I]t's not a lottery . . . [i]t's not an opportunity to retire." 7 RP at 1008, 1023.

In her rebuttal, Gilmore's lawyer seemed to mischaracterize Jefferson Transit's analogy to police shootings, stating that the lawyer talked about the government and "how [it] murders innocent people . . . [and] gets away with it." 7 RP at 1031. She continued, stating:

> But that's what the government does . . . no one holds them accountable . . . [W]hen you fight the government, they impugn your credibility. They call you a liar . . . a cheat . . . a fraud. . . .
> But [Gilmore] isn't willing to roll over . . . [If] you don't hold the government accountable . . . they will just keep doing what they're doing. That they will feel like they can run into anybody in this community and just walk away.

7 RP at 1031-32.

Gilmore's lawyer argued that the jurors were people of the community and urged them to ask themselves what this was worth in their community. She sought $1.8 million in damages. Jefferson Transit did not object to Gilmore's closing arguments.

III.    VERDICT & MOTION FOR NEW TRIAL

The jury returned a verdict in Gilmore's favor and awarded $1.2 million for past and future non-economic damages. Jefferson County moved for a new trial or remittitur. It argued that numerous irregularities and party misconduct justified relief, and that the excessive verdict was a result of Gilmore's misconduct. It had three main bases for its motion.

13

First, Jefferson Transit argued that Gilmore violated court rulings by presenting testimony that he lost his job and had worries about his ability to work and how to provide for his family. It argued that but for the court's rulings, Jefferson Transit could have shown that Gilmore had income from L&I time loss and a large permanent partial disability award.

Second, Jefferson Transit asserted that Gilmore put on impermissible character evidence in violation of the court's order after claiming that Jefferson Transit called him "a liar, a cheat and a fraud" in violation of the order in limine. CP at 407. Gilmore's false attribution of the pejorative to Jefferson Transit throughout trial was designed solely to arouse the passion of the jury.

Third, Jefferson Transit argued that Gilmore intentionally inflamed the jury by improperly seeking punitive damages to "fight the government," a strategy that caused the jury to reach an excessive verdict. CP at 423.

The trial court denied Jefferson Transit's motion. It acknowledged that while the case was "hard-fought" and "characterized by aggressive advocacy," it could not find party misconduct or violations sufficient to justify a new trial, nor could it find a basis to overturn the verdict. CP at 724.

Jefferson Transit appeals.

## ANALYSIS

I. EVIDENTIARY ERRORS

A. Standard of Review

We review a trial court's evidentiary rulings for an abuse of discretion. *City of Spokane v. Neff*, 152 Wn.2d 85, 91, 93 P.3d 158 (2004). A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *Mayer v.*

*Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006). The same standard applies when we review the admissibility of expert evidence. *Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 352, 333 P.3d 388 (2014).

When a trial court relies on unsupported facts or applies the wrong legal standard, its decision is exercised on untenable grounds. *Mayer*, 156 Wn.2d at 684. If the trial court applies the correct legal standard to the supported facts, but adopts a view no reasonable person would take, its decision is manifestly unreasonable. *Mayer*, 156 Wn.2d at 684.

B.      Excluding Tencer's Testimony

Jefferson Transit argues that the trial court improperly excluded Dr. Tencer's testimony because it relied on the wrong legal standard. It argues that Tencer was allowed to rely on facts not in evidence and that he met the legal criteria for admission of his testimony. We conclude that the trial court's exclusion of Tencer's testimony constitutes reversible error.

"[E]xpert testimony is admissible if (1) the expert is qualified, (2) the expert relies on generally accepted theories in the scientific community, and (3) the testimony would be helpful to the trier of fact." *Johnston-Forbes*, 181 Wn.2d at 352. In applying this test, trial courts are afforded wide discretion. *Johnston-Forbes*, 181 Wn.2d at 352. The court's rulings on expert opinions will not be disturbed absent abuse of discretion.[3] *Johnston-Forbes*, 181 Wn.2d at 352.

---

[3]      Both parties cite to *Johnston-Forbes*, a case where admitting Tencer's biomechanical engineering testimony was at issue. In that case, our Supreme Court acknowledged that some courts allowed Tencer's testimony and some excluded it. *Johnston-Forbes*, 181 Wn.2d at 353 (citing to *Ma'ele v. Arrington*, 111 Wn. App. 557, 560, 45 P.3d 557 (2002), and *Stedman v. Cooper*, 172 Wn. App. 9, 292 P.3d 764 (2012)).

*Johnston-Forbes* involved a low-speed collision where fault was not at issue and it was undisputed that the plaintiff had a herniated disc in her neck. 181 Wn.2d at 349-50, 356. As in this case, the jury was charged with determining whether the defendant's actions were the cause of the plaintiff's herniated disc. *Johnston-Forbes*, 181 Wn.2d at 356. Tencer's testimony helped the jury understand what forces might have been involved in the collision and he compared those

15

If the basis for admission of evidence is "'fairly debatable,'" we do not disturb the trial court's ruling. *Johnston-Forbes*, 181 Wn.2d at 352 (quoting *Grp. Health Coop. of Puget Sound, Inc., v. Dep't of Revenue*, 106 Wn.2d 391, 398, 722 P.2d 787 (1986)) (internal quotation marks omitted). Exclusion of evidence which is cumulative or has speculative probative value is not reversible error. *Havens v. C & D Plastics, Inc.*, 124 Wn.2d 158, 169-70, 876 P.2d 435 (1994).

An expert may testify regarding scientific, technical, or other specialized knowledge if it will assist the trier of fact in understanding the evidence or determining a fact at issue. ER 702. The expert must base his or her opinion or inference on facts or data in the case perceived by or made known to the expert at or before the hearing. ER 703. "If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." ER 703.

In this case, Tencer was clearly a "qualified" expert whose testimony relied on "generally accepted theories in the scientific community." *Johnston-Forbes*, 181 Wn.2d at 352. Tencer had a Ph.D. in Mechanical Engineering along with professional and academic expertise in orthopedics and biomechanical forces. He planned to testify to the severity of the impact and the forces produced on Gilmore using calculations based on "fundamental engineering principles such as the conservation of energy, momentum, and restitution." CP at 366. Given that issues on causation of the injury and the nature and extent of the injury existed, his testimony could have been helpful to the jury in understanding and assessing the differing opinions offered at trial. He had previously testified on similar subjects in Washington.

---

forces to activities of daily living. *Johnston-Forbes*, 181 Wn.2d at 356. Our Supreme Court found that the trial court acted within its discretion in allowing Tencer's testimony and affirmed. *Johnston-Forbes*, 181 Wn.2d at 357. It emphasized that, admitting expert testimony is based on a case-by-case, fact-specific inquiry. *Johnston-Forbes*, 181 Wn.2d at 358 (Yu, J., concurring).

The court excluded the proffered testimony because Tencer made "a number of assumptions, some of which [were] based on facts that [were] not going to be in evidence." 1 RP at 39. The court also excluded the testimony because the testimony was "intended to create an inference with some aura of authority" that it did not believe was "reasonable or justified." 1 RP at 39.

These rulings were erroneous. Experts are permitted to rely on facts not in evidence if the information or data is of the type reasonably relied on by experts in the particular field in forming opinions or inferences on the subject. ER 703. By relying on the wrong legal standard, the trial court excluded Tencer's testimony based on an untenable reason.

Tencer had extensive education and experience in biomechanics related to injury prevention, and testified in several cases involving similar issues. In formulating his opinion, Tencer relied on the disparate weights of the vehicles involved in the collision, determined the speed of the striking vehicle based on the level of damage, and considered other facts such as the head restraint design. He calculated the forces operating on Gilmore based on fundamental engineering principles. While the data underlying his calculations were not in evidence, it was of a type reasonably relied on by experts in his field in forming opinions on the subject. ER 703.

The trial court also found that Tencer's testimony would be confusing or misleading to the jury. The court did not elaborate on this finding, but seemed to agree with Gilmore's argument that the information was irrelevant since the jury will "figure out" from testimony and photographs that "a bus going slow that hits another vehicle [does] not result[ ] in a catastrophic collision." 1 RP at 37.

Tencer's testimony, however, was neither cumulative nor speculative. Because a disputed issue existed as to the cause and nature and extent of Gilmore's injury, Tencer's testimony would

17

have allowed the jurors to make a more informed decision, especially given the contradictory evidence that the collision was not significant enough to cause injury. His testimony would have been subject to cross-examination and the weight of his testimony would have been determined by the jury. By erroneously excluding Tencer's testimony, Jefferson Transit could not present its theory of the case. The trial court, therefore, abused its discretion when it excluded the testimony by applying the wrong legal standard. We, therefore, conclude that excluding Tencer's testimony constitutes reversible error requiring remand.

Given our conclusion above, we need not decide the remaining issues. However, because some are likely to reoccur at trial, we choose to briefly address them.

C.      Admitting Masci's Testimony

Jefferson Transit argues that Masci's testimony exceeded the scope of his chiropractic expertise because he gave opinions on surgical and neurological issues. It also argues that his opinions regarding Gilmore's injuries and credibility were speculative and based on unreliable information. We disagree.

A chiropractor is competent to testify as an expert on matters within the scope of his or her profession. *Brannan v. Dep't of Labor & Indus.*, 104 Wn.2d 55, 63, 700 P.2d 1139 (1985). "The practice of chiropractic in Washington includes 'diagnosis or analysis and care or treatment of the vertebral subluxation complex and its effects, articular dysfunction, and musculoskeletal disorders.'" *Loushin v. ITT Rayonier*, 84 Wn. App. 113, 119, 924 P.2d 953 (1996) (quoting RCW 18.25.005(1)). As part of a chiropractic differential diagnosis, chiropractors perform physical examinations and take x-rays to determine the need for chiropractic care or the need for referral to other health care providers. RCW 18.25.005(3). Chiropractic care does not include prescribing or dispensing of drugs or performing surgery. RCW 18.25.005(4).

18

At trial, Masci explained that "a herniated disc will invariably have neurological signs" and elaborated on the effect of pinched nerves. 3 RP at 343. He had training to diagnose neurological conditions for the purpose of referring patients to specialists.

Although part of Masci's opinion relied on the inaccurate medical history Gilmore provided him, Masci also reviewed Gilmore's medical records and conducted a physical exam. His expertise included explaining issues related to nerves and neurological symptoms. Further, Masci did not give a medical opinion on Gilmore's carpal tunnel surgery. He only explained what the records showed regarding the surgery. We, therefore, conclude that the trial court did not abuse its discretion in admitting Masci's testimony.

D.    Excluding Gilmore's L&I Payments

Jefferson Transit argues that the trial court erroneously excluded Gilmore's L&I payments. It argues that the collateral source rule was inapplicable because Gilmore only sought general damages and was not receiving payments for his pain and suffering. For these reasons, Gilmore was not at risk of being undercompensated by admitting the evidence. Alternatively, Jefferson Transit argues that if the L&I payments should have been excluded, the trial court erred by ruling that Gilmore could not open the door to collateral source evidence. We agree that Gilmore opened the door to evidence of the L&I payments.

The collateral source rule states that payments received by the injured party from a source independent of the tortfeasor will not reduce recoverable damages from the tortfeasor. *Cox v. Spangler*, 141 Wn.2d 431, 439, 5 P.3d 1265 (2000). A trial court generally excludes evidence that the plaintiff received compensation from a third party for an injury for which the defendant has liability. *Cox*, 141 Wn.2d at 439. "The 'rule is designed to prevent the wrongdoer from benefitting

from third-party payments.'" *Cox*, 141 Wn.2d at 439 (quoting *Cox v. Lewiston Grain Growers, Inc.*, 86 Wn. App 357, 375, 936 P.2d 1191 (1997)).

"Injured parties may, however, waive the protections of the collateral source rule by opening the door to evidence of collateral benefits." *Johnson v. Weyerhaeuser Co.*, 134 Wn.2d 795, 804, 953 P.2d 800 (1998). In *Johnson*, the court held that evidence of collateral benefits received by the petitioner's wife was only admissible if the petitioner "opened the door" by testifying, for example, that due to the wife's injuries, the petitioner's "family did not have as much money as [it] used to." *Johnson*, 134 Wn.2d at 804 (internal quotations omitted).

At trial, Jefferson Transit argued that Gilmore did not seek reimbursement for medical damages or loss of future earnings; therefore, the evidence was not prejudicial. The court ruled that it would not admit the L&I payments unless the door was opened. When Gilmore's lawyer continued to elicit testimony that Gilmore was financially suffering because of his injury from the accident, Jefferson Transit argued that the L&I payments should be admissible to rebut the testimony.

Here, the L&I payments were protected by the collateral source rule; however, the trial court erred by excluding the evidence when Gilmore opened the door. Gilmore elicited testimony from his witnesses about Gilmore's stress over his finances due to the accident. Gilmore waived the protections of the collateral source rule when he opened the door by introducing such testimony. Because Gilmore opened the door and the trial court relied on an incorrect legal standard in excluding the evidence, its decision was exercised on untenable grounds.

To the extent that the trial court ruled that such evidence could never come in, we conclude that excluding the L&I payments after Gilmore opened the door to its admission was error.

III.    MOTION FOR NEW TRIAL

A.    Standard of Review

We review an order denying a motion for a new trial for an abuse of discretion. *Aluminum Co. of Am. v. Aetna Cas. & Surety Co.*, 140 Wn.2d 517, 537, 998 P.2d 856 (2000). "[A] trial court abuses its discretion in denying a motion for a new trial 'if such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent a litigant from having a fair trial.'" *Mears v. Bethel Sch. Dist. No. 403*, 182 Wn. App. 919, 926, 332 P.3d 1077 (2014) (quoting *Alum. Co. of Am.*, 140 Wn.2d at 537) (internal quotation marks omitted), *review denied*, 182 Wn.2d 1021 (2015). "[D]eference usually shown to a trial court's denial of a new trial does not apply when the court based the decision on an issue of law." *Mears*, 182 Wn. App. at 927. Denial of a new trial based on an issue of law is reviewed de novo. *Mears*, 182 Wn. App. at 927.

B.    Party Misconduct

A new trial may be granted if the misconduct of the prevailing party materially affected the substantial rights of the losing party. *Teter v. Deck*, 174 Wn.2d 207, 222, 274 P.3d 336 (2012). The moving party must establish that the conduct complained of constituted misconduct, as distinct from mere aggressive advocacy, and the misconduct was prejudicial in the context of the entire record. *Miller v. Kenny*, 180 Wn. App. 772, 814, 325 P.3d 278 (2014). "'The trial court is in the best position to most effectively determine if [a lawyer's] misconduct prejudiced a [party's] right to a fair trial.'" *Teter*, 174 Wn.2d at 223 (quoting *State v. Lord*, 117 Wn.2d 829, 887, 822 P.2d 177 (1991)). "[A] party may not 'wait and gamble on a favorable verdict' before claiming error." *Teter*, 174 Wn.2d at 225 (quoting *Nelson v. Martinson*, 52 Wn.2d 684, 689, 328 P.2d 703 (1958)).

An appeal to the passions and prejudices of the jury rather than argument based on inferences gleaned from the evidence is improper. *M.R.B. v. Puyallup Sch. Dist.*, 169 Wn. App.

837, 859, 282 P.3d 1124 (2012). Therefore, it is improper for a lawyer to invite the jury to decide a case based on anything other than the evidence and the law, including appeals to sympathy, prejudice, and bias. *M.R.B.*, 169 Wn. App. at 858. Although a lawyer is given wide latitude in arguing the evidence to the jury in his or her closing argument, "'a case should be argued upon the facts without an appeal to prejudice.'" *M.R.B.*, 169 Wn. App. at 858 (quoting *Day v. Goodwin*, 3 Wn. App. 940, 944, 478 P.2d 774 (1970)) (internal quotation marks omitted).

We may refuse to review any claim of error which was not raised at trial. RAP 2.5(a). To preserve an error relating to lawyer misconduct, a party must object to the statement, seek a curative instruction, and move for a mistrial or new trial. *City of Bellevue v. Kravik*, 69 Wn. App. 735, 743, 850 P.2d 559 (1993). However, the issue of misconduct may be raised on appeal absent an objection if "the misconduct is so flagrant and ill intentioned that no curative instructions could have obviated the prejudice engendered by the misconduct." *Kravik*, 69 Wn. App. at 743.

1.     Inflaming the Jury's Passion and Prejudice

Jefferson Transit argues that Gilmore's lawyer in her closing argument improperly asked the jury to award punitive damages to "send a message," and incited the jury's passion and prejudice by making inflammatory arguments which led to an excessive verdict. Br. of Appellant at 47. Gilmore argues that Jefferson Transit waived any error because it did not object during closing arguments. We conclude that Gilmore's closing arguments inflamed the jury by appealing to the passion of the jurors, which lead to an arguably excessive damages award.

Gilmore's lawyer's inflammatory arguments appealed to the passion of the jurors when she repeatedly called upon the jurors to help Gilmore "fight the government" and "hold the government accountable." 7 RP at 991, 1032. The lawyer argued that Jefferson Transit was attempting to "cover up" liability. 7 RP at 985. She mischaracterized Jefferson Transit's analogy

to police shootings caught on video by stating that the lawyer talked about "how the government murders innocent people . . . [and] gets away with it . . . [b]ut that's what the government does . . . no one holds them accountable." 7 RP at 1031.

Although Jefferson Transit did not object to the inflammatory arguments, we conclude that the misconduct was so flagrant and ill-intentioned that no curative instruction could have "obviated the prejudice engendered by the misconduct." *Kravik*, 69 Wn. App. at 743. Here, the lawyer's arguments were flagrant and ill-intentioned because it encouraged the jury to punish Jefferson Transit for what it was trying to "get[ ] away with." 7 RP at 1031. A curative instruction ordering the jury to disregard the arguments could not have removed the prejudice engendered by the arguments. We, therefore, conclude that the inflammatory remarks led to an arguably excessive damages award because it incited the passion and prejudice of the jurors.

### 2. Accusations of Fraud

Jefferson Transit argues that Gilmore improperly accused it of fraud and, in doing so, Gilmore "crossed the line from mere aggressive advocacy to prejudicial and reversible misconduct." Br. of Appellant at 47. Jefferson Transit cites only to accusations of fraud in Gilmore's closing arguments. We agree that the lawyer's accusations of fraud was improper.

During opening and closing arguments, Gilmore's lawyer accused Jefferson Transit of fraud on numerous occasions and implied impropriety in the way it handled their defense. At the outset of trial, Gilmore's lawyer told the jury that Jefferson Transit planned to depict Gilmore as "a liar, a cheat and a fraud." 3 RP at 274. During closing arguments, Gilmore's lawyer stated, "[T]here has been a fraud perpetrated in this courtroom. . . . There has been someone in this trial who has continually tried to mislead you. . . . I'm going to talk to you about some of the . . . frauds that [Jefferson Transit] has tried to perpetuate." 7RP at 978-79.

Although Jefferson Transit did not object to these remarks, the issue can still be raised on appeal because the lawyer's misconduct was so flagrant and ill-intentioned that no curative instruction could have obviated the prejudice engendered by the misconduct. Here, Gilmore's lawyer's remarks were clearly inflammatory and improper, and her conduct went beyond aggressive advocacy. In the context of the entire record, it was highly prejudicial to Jefferson Transit's case. We, therefore, conclude that the lawyer's accusations of fraud was misconduct that, viewed in the context of the entire record, prejudiced Jefferson Transit's case.

We reverse and remand.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We conclude:

_____
Johanson, J.

_____
Bjorgen, C.J.