FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 FEB 20 AM 8: 29

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ELLA ELIAS, individually, and DAVID PROUDFOOT, individually, | ) ) ) No. 75848-9-I |
| Respondents, | ) ) DIVISION ONE |
| STEVE STRAND, individually, | ) ) ) UNPUBLISHED OPINION |
| Plaintiff, | ) ) |
| v. | ) ) |
| CITY OF SEATTLE, a political subdivision of Washington State, | ) ) ) |
| Appellant. | ) FILED: February 20, 2018 ) ) |

LEACH, J. — The city of Seattle (City) appeals the trial court's denial of its motion for a remittitur or, alternatively, a new trial. Three police officers sued the City. A jury awarded substantial damages to two officers but rejected the third officer's claim. The City fails to show that the damages awards are not supported by substantial evidence, shock the conscience, or were the result of passion or prejudice. It also does not show that any alleged misconduct or error during trial prejudiced the City. We affirm.

## FACTS

On June 23, 2014, Kathleen O'Toole became chief of the Seattle Police Department (SPD). She promoted then-Lieutenant Dave Proudfoot to captain

and assigned him to lead the South Precinct. On July 21, Sergeant Ella Elias filed a notice of a claim stating that she intended to sue the City. This notice described hostile work environment, gender discrimination, and retaliation claims.[1]

On September 15, O'Toole issued an investigatory transfer order that temporarily reassigned Elias from the South Precinct to the West Precinct. O'Toole ordered the transfer to facilitate the SPD's investigation of pending EEO complaints against Elias and Elias's claim against the City.

When Captain Proudfoot received the order, he e-mailed four members of the command staff, including O'Toole, to voice his opposition to the transfer. He stated, "[M]oving her [could] be seen as retaliation for filing an EEO-based lawsuit." The SPD permanently transferred Elias to the West Precinct on December 3, 2014. In April 2015, O'Toole transferred Proudfoot to lead the SPD's training unit where he had served before she promoted him to captain of the South Precinct.

Elias filed this lawsuit in November 2014. She asserted the claims described in her notice. An amended complaint filed in February 2016 added

---

[1] Elias based her claims on the hostility she experienced after informing her lieutenant and captain in 2011 that four African American officers from the South Precinct were "hand picked" for a nightclub emphasis overtime assignment. She claimed the program was not open to all patrol officers as it should have been. The alleged hostile acts toward Elias included select officers filing equal employment opportunity (EEO) complaints against her, claiming that she created a hostile work environment for African American patrol officers.

Proudfoot and another officer, Steve Strand, as plaintiffs. They each asserted retaliation claims.

On the first day of trial, Elias voluntarily dismissed her hostile work environment and gender discrimination claims. She proceeded only with her claim that the SPD transferred her in retaliation for filing her tort claim. Proudfoot and Strand proceeded with their claims that the SPD retaliated against them for opposing Elias's transfer.

The jury found that the SPD had retaliated against Elias and Proudfoot but rejected Strand's claim. The jury awarded Elias $400,000 in economic damages and $1.5 million in noneconomic damages. It awarded Proudfoot $182,000 in economic damages and $750,000 in noneconomic damages. While the damages awards totaled $2,832,000, the officers' counsel had asked the jury to award more in closing argument. The City asked the trial judge to reduce the damages awards or, alternatively, for a new trial. The trial court denied the City's request. The City appeals this decision.

## ANALYSIS

### Remittitur and New Trial

We review the trial court's denial of a remittitur for abuse of discretion.[2] We will not reduce the jury's damages award unless it is not supported by

---

[2] Bunch v. King County Dep't of Youth Servs., 155 Wn.2d 165, 172-73, 116 P.3d 381 (2005).

substantial evidence in the record, shocks the conscience of the court, or is the result of passion or prejudice.[3] We do not review the jury's decisions about witness credibility or the weight to be given evidence.[4] "We strongly presume the jury's verdict is correct."[5] "A trial court's denial of a remittitur strengthens the verdict."[6]

We review the denial of a motion for a new trial for abuse of discretion.[7] "A court abuses its discretion when its decision adopts a view that no reasonable person would take or that is based on untenable grounds or reasons."[8] "We review a trial court's denial of a new trial more critically than . . . its grant of a new trial because a new trial places the parties where they were before, but a decision denying a new trial concludes their rights."[9]

A.    *Substantial Evidence*

The City challenges only the sufficiency of the evidence to support the jury's monetary awards, not its liability decisions. A damages award must be supported by substantial evidence and is not when the record contains

---

[3] Bunch, 155 Wn.2d at 179.
[4] State v. Smith, 31 Wn. App. 226, 228, 640 P.2d 25 (1982).
[5] Bunch, 155 Wn.2d at 179.
[6] Bunch, 155 Wn.2d at 180.
[7] State v. Boyle, 183 Wn. App. 1, 12, 335 P.3d 954 (2014).
[8] Boyle, 183 Wn. App. at 12-13.
[9] M.R.B. v. Puyallup Sch. Dist., 169 Wn. App. 837, 848, 282 P.3d 1124 (2012).

insufficient evidence to convince "'an unprejudiced, thinking mind.'"[10]  Generally, a party may raise on appeal only those issues raised at the trial court.[11]  But RAP 2.5(a)(2) permits a party to challenge the sufficiency of the evidence for the first time on appeal.[12]

### 1.  Economic Damages Awards

First, the City claims to challenge the sufficiency of the evidence supporting the jury's economic damages awards.  The City contends that the officers' expert economist, Dr. Christina Tapia, improperly calculated the amount of Elias's past lost overtime because she relied in part on overtime wages that Elias lost before her transfer.  The City asserts that this overtime was irrelevant in evaluating the lost overtime opportunities caused by her transfer.  But the City's claim does not challenge the sufficiency of Tapia's admitted testimony to support the jury's award.

Instead, for the first time on appeal, the City claims that the trial court should not have allowed the jury to consider Tapia's testimony.  Thus, the City really challenges the admission of evidence that it now claims is irrelevant.  Failure to object at trial to the admissibility of evidence based on relevance

---

[10] Bunch, 155 Wn.2d at 179 (internal quotation marks omitted) (quoting Indus. Indem. Co. v. Kallevig, 114 Wn.2d 907, 916, 792 P.2d 520 (1990)).

[11] In re Det. of Brown, 154 Wn. App. 116, 121, 225 P.3d 1028 (2010).

[12] RAP 2.5(a)(2) allows a party to raise for the first time on appeal the claimed error of "failure to establish facts upon which relief can be granted."

precludes appellate review of that issue.[13] The City did not ask the trial court to exclude Tapia's testimony before trial, did not object to Tapia's testimony, and did not ask the court to strike her testimony. Judge William Downing, a well-regarded trial judge with 28 years of superior court judicial experience, aptly observed in his order denying the City's request for a remittitur or new trial that "the defense case was marred by misdirection and missed opportunity." This may have been one of those missed opportunities.

The City also claims that the record does not show Elias lost past or future income as a result of the transfer. It asserts that Elias's "base pay" remained the same, and no evidence indicated that she worked more overtime in any earlier year or that it would be possible for her to work more overtime in the future. Elias testified that she was on track to make more money than she had made previously at the SPD.[14]

Tapia, however, testified that she based her past and future lost overtime calculations for Elias on her understanding of the amount of additional overtime Elias lost access to because of the transfer. Tapia stated that in making these calculations, she relied on the documents and data she reviewed and her

---

[13] State v. Florczak, 76 Wn. App. 55, 72, 882 P.2d 199 (1994).
[14] The City asked Elias if she was "on track to make $178,326 this year," and she answered, "Yes." The City then asked, "That's more money than you've ever made since you've been with the Seattle Police Department; right?" Elias answered, "I might have made more in 2013 and 2014 if my overtime hadn't been cut."

discussions with Elias. She assumed Elias would retire at age 56[15] and concluded that the transfer caused Elias to lose $731,008 in past and future overtime earnings and future retirement benefits. The City did not present any controverting expert testimony.

The jury awarded Elias $400,000 in economic damages. Thus, even without any guidance from the City, the jury awarded Elias an amount less than Tapia's conclusion. The jury's award was in the range of substantial evidence. The trial court did not abuse its discretion by refusing to remit Elias's economic damages award.

We hold similarly for Proudfoot. In April 2015, the SPD demoted Proudfoot from captain to leader of its training unit. This caused him to lose the 5 percent salary premium paid to captains. The City calculated that the 5 percent premium was worth $10,700 for the 16 months that Proudfoot had been at the training unit after the transfer. The City contends that this amount reflects Proudfoot's total past economic loss, well below the jury's $40,000 award for past economic damages.

Tapia testified, however, that Proudfoot's involuntary transfer resulted in past economic damages of $40,115. Tapia included in her calculations the additional amount Proudfoot would have earned had he become assistant chief

---

[15] Elias testified that she plans to retire at age 56 because she has an autoimmune disease that could prevent her from working.

in April 2015. Although Proudfoot did not apply for an assistant chief position, Tapia testified that she concluded he would have attained the position based on her conversations with Proudfoot and her understanding that he had several conversations with Chief O'Toole about the position. Tapia testified that the City's retaliation caused Proudfoot to lose $467,390 in past and future overtime earnings and future retirement benefits if he retired at age 60 or $546,763 if he retired at age 65. Again, the City did not call its own expert and did not provide the jury with its view of an appropriate damage award. The jury awarded him $182,000 in economic damages, an award well below the range of Tapia's testimony. Substantial evidence therefore supports the award. The trial court did not abuse its discretion in failing to reduce Proudfoot's economic damages award.

2.    Noneconomic Damages Awards

The City also challenges the sufficiency of the evidence supporting the jury's noneconomic damages awards to the officers. The jury awarded $1.5 million in noneconomic damages to Elias and $750,000 in noneconomic damages to Proudfoot. The City contends that these awards are excessive because both Elias and Proudfoot provided very limited supporting evidence.

But in <u>Bunch v. King County Department of Youth Services</u>,[16] our Supreme Court stated, "'The plaintiff, once having proved discrimination, is only required to offer proof of actual anguish or emotional distress in order to have those damages included in recoverable costs pursuant to RCW 49.60.'" "The distress need not be severe."[17] "'The jury's role in determining noneconomic damages is perhaps even more essential [than its role in determining economic damages].'"[18] In <u>Bunch</u>, the Supreme Court reversed this court's remittitur and held that the jury could infer emotional distress from "limited" evidence.[19] Bunch testified that the racially motivated employment discrimination he experienced overwhelmed him.[20] He stated that the discrimination made him depressed and angry and required that he explain to his family why the King County Department of Youth Services fired him.[21] He testified that after the department fired him, he worked for significantly less pay with minimal benefits.[22]

Here, the officers provided more substantial evidence of emotional distress than that in <u>Bunch</u>. Elias identified as causes of her emotional distress the loss of overtime and employment opportunities plus exposure to rumors

---

[16] 155 Wn.2d 165, 180, 116 P.3d 381 (2005) (quoting <u>Dean v. Mun. of Metro. Seattle</u>, 104 Wn.2d 627, 641, 708 P.2d 393 (1985)).

[17] <u>Bunch</u>, 155 Wn.2d at 180.

[18] <u>Bunch</u>, 155 Wn.2d at 179-80 (quoting <u>Sofie v. Fibreboard Corp.</u>, 112 Wn.2d 636, 646, 771 P.2d 711, 780 P.2d 260 (1989)).

[19] <u>Bunch</u>, 155 Wn.2d at 167, 180.

[20] <u>Bunch</u>, 155 Wn.2d at 180.

[21] <u>Bunch</u>, 155 Wn.2d at 180.

[22] <u>Bunch</u>, 155 Wn.2d at 180.

about why the SPD transferred her. She also testified that the SPD transferred her to the West Precinct when no work assignment existed there for her. The captain of the West Precinct told her, "'I don't know why they sent you here.'" The SPD kept her in a "no assignments" position for five months. And she worked double shifts to make up for lost income. This resulted in her not seeing her son and feeling "tired, crabby." She described the ramifications of her transfer as "hard to take." Consistent with Bunch, Elias's testimony provides sufficient support for the jury's $1.5 million noneconomic damages award.

Similarly, Proudfoot explained that his work at the SPD provided more than a job to him: it was a "calling." He testified that it was emotionally "gut-wrenching" to leave his work at the South Precinct and his coworkers whom he considers family. In accordance with Bunch, Proudfoot's testimony provides sufficient support for the jury's $750,000 verdict. The trial court did not abuse its discretion in failing to remit the jury's noneconomic damages awards for lack of substantial evidence.

B. *Shocks the Conscience of the Court*

Next, the City asserts that the jury's noneconomic damages awards should shock the conscience of the court. They do not.

A damages award shocks a court's conscience when it is "'flagrantly outrageous and extravagant.'"[23] The City concedes that Washington law generally does not "assess the amount of a verdict based upon comparisons with verdicts in other cases."[24] Instead, the City contrasts what it characterizes as the "sparse evidence" of emotional harm in this case with the evidence of emotional distress in another case involving the Washington Law Against Discrimination (WLAD),[25] Collins v. Clark County Fire District No. 5.[26]

In Collins, the jury awarded $875,000 in noneconomic damages to former employee of Clark County Fire District No. 5 Valerie Larwick, who experienced sexual harassment in the workplace.[27] The City notes that Clark County fired Larwick after she experienced over two years of sexually harassing comments and sexist treatment.[28] In addition, Larwick sought treatment for related emotional distress, including recurring nightmares, insomnia, and serious depression.[29]

---

[23] Bunch, 155 Wn.2d at 179 (quoting Bingaman v. Grays Harbor Cmty. Hosp., 103 Wn.2d 831, 836-37, 699 P.2d 1230 (1985)).

[24] Washburn v. Beatt Equip. Co., 120 Wn.2d 246, 268, 840 P.2d 860 (1992); Bertero v. Nat'l Gen. Corp., 13 Cal.3d 43, 65 n.12, 529 P.2d 608, 118 Cal. Rptr. 184 (1974) ("The vast variety of and disparity between awards in other cases demonstrates that injuries can seldom be measured on the same scale.").

[25] Ch. 49.60 RCW.

[26] 155 Wn. App. 48, 231 P.3d 1211 (2010).

[27] Collins, 155 Wn. App. at 73.

[28] Collins, 155 Wn. App. at 57-60.

[29] Collins, 155 Wn. App. at 86, 90-93.

The City contends that unlike this case, Collins illustrates circumstances in which it is apparent how the jury reached its "sizeable" noneconomic damages award. Here, the SPD only transferred the officers as opposed to firing them. Also, the officers did not seek treatment for their emotional distress or claim serious symptoms of distress. But emotional distress damages "need not be proved with mathematical certainty, [and need only] be supported by competent evidence."[30] The absence of more evidence in this case is not a lack of sufficient competent evidence, particularly when "[t]he distress need not be severe."[31] As discussed above, both Elias's and Proudfoot's testimony reflect actual anguish or emotional distress, which means the verdict is not "flagrantly outrageous." The trial court did not abuse its discretion in denying the City's request for a remittitur based on a shocks-the-conscience standard.

C.    Passion or Prejudice

The City identifies seven sources of alleged prejudice to support its request for a remittitur or, alternatively, a new trial. We will reduce the jury's damages awards only if the passion or prejudice is "unmistakable."[32] An error prejudices a party when it affects or presumably affects the outcome of trial.[33]

---

[30] Hill v. GTE Directories Sales Corp., 71 Wn. App. 132, 140, 856 P.2d 746 (1993).
[31] Bunch, 155 Wn.2d at 180.
[32] Bunch, 155 Wn.2d at 179 (quoting Bingaman, 103 Wn.2d at 836); see also RCW 4.76.030.
[33] Herring v. Dep't of Soc. & Health Servs., 81 Wn. App. 1, 23, 914 P.2d 67 (1996).

The City claims these sources of prejudice: the size of the damages awards alone; the officers' counsel's alleged suggestion in closing that the jury should base its damages awards on verdicts in similar cases; the officers' counsel's alleged misconduct during opening statements when counsel made unsupported, irrelevant statements about O'Toole; the officers' counsel's claimed violation of the court's order in limine excluding reference to related media coverage; the court's erroneous admission of expert testimony on police practices and that expert's improper testimony about whether the SPD retaliated; the court's failure to submit the City's proposed mitigation instruction; and the cumulative effect of these errors. We reject the City's claims of prejudice and hold that the trial court did not act unreasonably in its decision to deny the City's motion for a remittitur or, alternatively, a new trial.

### 1. The Size of the Awards

First, the City asserts that the size of the damages awards alone shows that the jury acted out of passion or prejudice, a claim replete with irony. The following table summarizes the expert testimony and closing argument about damages provided to the jury.

|  | Elias | Proudfoot | Strand |
|---|---|---|---|
| Officers' expert testimony about economic damages | $731,008 | $467,390 - $546,763 | $714,335 - $812,682 |
| City's expert testimony about economic damages | None | None | None |
| Officers' closing recommendation: | $731,008 | $467,390 - $546,763 | $714,335 - $812,682 |

| economic damages | | | |
|---|---|---|---|
| Officers' closing recommendation: total damages | $1 million - $3 million | $1 million - $3 million | $1 million - $3 million |
| City's closing recommendation: economic damages | No recommendation | No recommendation | No recommendation |
| City's closing recommendation: total damages | No recommendation | No recommendation | No recommendation |
| Economic damages awarded | $400,000 | $182,000 | $0.00 |
| Noneconomic damages received | $1.5 million | $750,000 | $0.00 |
| Total damages received | $1.9 million | $932,000 | $0.00 |

The jury awarded Elias about 55 percent of the economic damages calculated by her expert and total damages in the middle of the range suggested by her counsel as reasonable. The jury awarded Proudfoot about 39 percent of the low end of the economic damages calculated by his expert and total damages less than the minimum suggested by his counsel as reasonable. The City did not provide the jury with any expert testimony or closing argument to guide the jury's damage decision. As Judge Downing observed, the officers' damages evidence and closing argument recommendations were "not challenged or contradicted by the defense and the jury ultimately settled on amounts toward the lower end of what they may then have seen as an agreed range."

The City cannot credibly claim the size of the verdict shows passion or prejudice when it failed to provide the jury with any evidence or argument to

guide the jury's damage decisions. And the fact that the jury rejected Strand's claim and did not award the other officers the full amount requested further suggests that it acted not out of passion, but deliberately.

In addition, damages awards within the range of substantial evidence are not the result of passion or prejudice as a matter of law.[34] The trial court therefore did not abuse its discretion in denying a remittitur or a new trial based on the amount of the awards alone.

### 2. Counsel's Alleged Misconduct in Closing Argument

Again for the first time on appeal, the City claims that the officers' counsel's misconduct in closing argument prejudiced it. Because the City did not object below, it may not raise this issue on appeal unless it proves that the alleged misconduct was "'so flagrant that no instruction could have cured the prejudicial effect.'"[35] Conduct is flagrant when a party engages in repetitive prejudicial conduct that is ill intentioned; generally, flagrant misconduct means pervasive misconduct.[36] In State v. Walker,[37] for example, Division Two held that

---

[34] See Brundridge v. Fluor Fed. Servs, Inc., 164 Wn.2d 432, 453-58, 191 P.3d 879 (2008) (denying Fluor's CR 59 motion for a new trial or amended judgment and holding that the awards in question were supported by the evidence and therefore not the result of passion or prejudice as a matter of law).

[35] M.R.B., 169 Wn. App. at 857-58 (internal quotation marks omitted) (quoting Collins, 155 Wn. App. at 94).

[36] See, e.g., State v. Walker, 164 Wn. App. 724, 737, 265 P.3d 191 (2011) (holding prosecutor's repetitive prejudicial misconduct warranted reversal); Teter v. Deck, 174 Wn.2d 207, 223-25, 274 P.3d 336 (2012) (affirming trial court's grant of a new trial based on the officers' counsel's repeated misconduct).

[37] 164 Wn. App. 724, 738, 265 P.3d 191 (2011).

the cumulative effect of the prosecutor's repetitive prejudicial misconduct warranted reversal because "the prosecutor made the improper comments not just once or twice, but frequently." In addition, the "case was largely a credibility contest, in which the prosecutor's improper arguments could easily serve as the deciding factor."[38]

The City asserts that the officers' counsel engaged in prejudicial misconduct during closing argument by suggesting that the jury decide the case based on a "typical" award in similar cases. The City mischaracterizes counsel's statements. The officers' counsel stated, "[A] jury verdict award in cases like this, for a proper reasonable one, again your decision, would be in the range of one to three million for each [plaintiff]." She then told the jury, "And I give you a range for a reason. Even though anywhere in that range would be consistent with what we have heard in this case, I submit to you. It's your decision. You get to figure it out."

Counsel may suggest a range of damages to a jury, but "[i]t is improper for counsel to invite the jury to decide a case based on anything other than the evidence and the law, including appeals to sympathy, prejudice, and bias."[39] At trial, however, the officers' counsel stated only that a "reasonable" award in "cases like this" would be within a certain range. "Typical" and "reasonable" are

---

[38] Walker, 164 Wn. App. at 738.
[39] M.R.B., 169 Wn. App. at 858.

distinct. "Typical" would improperly suggest that the jury should base its awards on what are usual damages awards in similar cases. "Reasonable," however, is a subjective determination that does not suggest the jury should necessarily return an award that is influenced by any other; a reasonable award may not be the typical award in similar cases. Because the City has not shown that counsel's statement constitutes misconduct, we decline to review the issue.

3. Counsel's Alleged Misconduct during Opening Statements

Next, the City claims that the officers' counsel committed prejudicial misconduct during his opening statement when he personally attacked O'Toole with unsupported, irrelevant statements. "Testimony may be anticipated [in opening] so long as counsel has a good faith belief such testimony will be produced at trial."[40] The City again concedes, however, that at trial it failed to object based on misconduct. As discussed above, the City's failure to object means it may not raise the issue on review unless the statements were so flagrant that an instruction could not have cured the prejudice.[41] The City asserts that neither party presented evidence at trial to support any one of the following five statements the officers' counsel made during his opening statement. It claims that no curative instruction could have prevented the prejudice resulting from this "smear" campaign.

---

[40] State v. Campbell, 103 Wn.2d 1, 16, 691 P.2d 929 (1984).
[41] See M.R.B., 169 Wn. App. at 857-58.

-17-

(1) The officers' counsel showed a photo of O'Toole standing behind Michele Obama and said, "[W]hat we have found is the evidence in this case suggests that Chief O'Toole is not so much invested in Seattle as she is invested . . .with Seattle potentially as being a stepping stone."

(2) "What you are going to hear is that even back in Boston, Chief O'Toole was known for catering to the people that can get her her next job more than catering to the front line officers that she's designed to support."

(3) "What you are going to hear is that in Boston, Chief O'Toole was actually found, by virtue of a no confidence vote by an oversight committee, to be unable to effectively manage . . . a diverse work force back in Boston."

(4) Although Seattle City Council "allocated . . . $40,000 for her move when her husband still lives on the east coast. . . . It turns out that [she] still rents an apartment. And I think the evidence is going to show I think she even rents her furniture."

(5) Chief O'Toole was "going out and speaking in these different environments, spending a lot of time on the east coast," and the jury should therefore consider whether she was making decisions about the South Precinct in a "misguided effort to serve [her]self."

The City contends that the officers' counsel improperly made these prejudicial statements to persuade the jury that O'Toole was making short-term

decisions to satisfy the Department of Justice at the expense of the long-term welfare of the SPD. Although the officers do not contest the City's assertion that they presented no evidence at trial to support these statements, they assert that the statements were not ill intentioned. They contend that their counsel had a good-faith basis to inquire about O'Toole's work history and motivations because they were relevant in a retaliation action.

We conclude that the challenged conduct was not sufficiently pervasive to be prejudicial. Thus, we do not need to decide whether counsel made those statements in good faith. The parties either did not repeat the challenged statements in front of the jury or witness testimony rebutted the claims. Before O'Toole's testimony and outside the presence of the jury, the trial court ordered the officers' counsel not to question O'Toole about the substance of statement (3) unless O'Toole first raised the issue when discussing her background. Neither party raised the issue again. The jury therefore heard about the "no confidence vote" only the one time during the officers' counsel's opening statement.

In addition, O'Toole testified that contrary to statement (4), her husband lives in Seattle and she does not rent her furniture. Although the City claims that it had "no effective means of rebutting the false insinuation [embodied in the remaining three statements] that [O'Toole] saw Seattle as a stepping stone,"

O'Toole rebutted the contention through her testimony. She stated, "At this point in my career, this is not a stepping stone. . . . As far as I'm concerned, this is it."

We distinguish this case from Walker. In Walker, the prosecutor made improper comments "not just once or twice, but frequently."[42] That did not happen here. For each challenged statement, either counsel did not repeat it or O'Toole's testimony negated it. Because the City has not shown that the alleged misconduct was flagrant, it did not preserve the issue.

4.    Counsel's Violation of the Court's Order in Limine

The City also asserts that the officers' counsel committed prejudicial misconduct by violating an order in limine excluding any reference to "evidence regarding media/news coverage of the lawsuit." Here, the City objected to each of the three instances in which the officers' counsel referenced related media coverage at trial. "[A] court properly grants a new trial where (1) the conduct complained of is misconduct, (2) the misconduct is prejudicial, (3) the moving party objected to the misconduct at trial, and (4) the misconduct was not cured by the court's instructions."[43]

In violation of the court's original order in limine, the officers' counsel questioned both O'Toole and Elias about newspaper articles related to the case and mentioned the articles in closing. But a court may revise its order or ruling at

---

[42] Walker, 164 Wn. App. at 738.
[43] Teter, 174 Wn.2d at 226.

any time before final judgment.[44]   The court's conduct at trial implies that it revised its order in limine to allow reference to media coverage to establish the timing of events and whether the SPD retaliated.   Based on the court's conduct described below, the officers' counsel did not violate the court's modified order in limine.

The officers' counsel first referenced related newspaper articles when questioning O'Toole.   O'Toole stated that she routinely Googled her name and the SPD in the morning to apprise herself of any issues.   The officers' counsel then asked, "Do you think if there were multiple newspaper articles in the news about and alleging Chief Metz running a gravy train in relation to the Robert squad in the South Precinct, that's something you probably would have read?"   When O'Toole said that she recalled the headline, the officers' counsel asked if she was referring to articles "from November 2014, the gravy train articles?"   The City objected.   The trial court did not rule on the objection but instead asked O'Toole if she "arrived [at the SPD] in the summer of '14?" and if she "became familiar with the issue we're talking about" at that point.   O'Toole answered that she remembered seeing a headline and scanning an article.   Here, the court suggested that it was permissible to use media coverage to establish a timeline of events.

---

[44] State v. Kinard, 39 Wn. App. 871, 873, 696 P.2d 603 (1985).

The officers' counsel again referenced the "gravy train" articles when questioning Elias. Elias testified that she could not remember the exact date on which she filed her lawsuit and needed "something to refresh [her memory]." The officers' counsel then asked if a document it had provided her "helped assist [her] in remembering when an article appeared in the Seattle Times indicating—." The City objected. The trial court again did not rule on the objection but suggested that the officers' counsel ask the date Elias filed the lawsuit and if and when a story appeared in the press about the filing of that lawsuit. Counsel then asked, "Do you recall the date that there was an article in the Seattle Times about the filing of the lawsuit?" Elias answered, "December 2, 2014." Again, the trial court indicated that counsel could use media coverage to establish a timeline.

The officers' counsel mentioned the "gravy train" articles for a third time in closing to reference the date that Elias filed her lawsuit and to emphasize that O'Toole permanently transferred Elias one day after the press published the articles. The court overruled the City's objections by stating, "[W]e have discussed it and established the context is proper context because the jury will consider whether [the articles] did or did not relate to the decision making at issue." The court again effectively revised its order in limine to allow counsel to reference the fact of news coverage as it related to a retaliatory motive. Because

the officers' counsel's questioning comported with the court's revised order in limine, counsel's statements did not constitute misconduct.

### 5. Erroneous Admission of Expert Testimony

The City next contends that the trial court abused its discretion when it permitted former Bellevue Chief of Police D.P. Van Blaricom to testify as an expert and offer a legal conclusion. In its order in limine, the trial court permitted expert witness Van Blaricom to testify only about "matters of police administration such as 'chain of command' and the role of 'officer morale' and related problems of 'preferential assignments.'" The court prohibited Van Blaricom from expressing "opinions on whether there was or was not 'discrimination,' 'retaliation,' 'an EEO violation' or a 'hostile work environment.' Nor [could] he opine as to whether anything occurred 'because of' race or gender."

ER 702 allows expert testimony if the witness qualifies as an expert and his opinions will assist the trier of fact.[45] We review the court's admission of expert testimony for abuse of discretion.[46] We will not disturb the trial court's ruling "[i]f the basis for admission of the evidence is 'fairly debatable.'"[47]

---

[45] Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha, 126 Wn.2d 50, 102, 882 P.2d 703 (1994).

[46] Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wn.2d 654, 683, 15 P.3d 115 (2000).

[47] Johnston-Forbes v. Matsunaga, 181 Wn.2d 346, 352, 333 P.3d 388 (2014) (internal quotation marks omitted) (quoting Grp. Health Coop. of Puget Sound, Inc. v. Dep't of Revenue, 106 Wn.2d 391, 398, 722 P.2d 787 (1986)).

First, the City claims that the trial court abused its discretion when it allowed Van Blaricom to testify as an expert about the soundness of the SPD's management decisions. Van Blaricom told the jury that he was an expert in "[p]olice practices." He explained why he believed the officers' transfers were not "quality management decisions." He also discussed how the SPD should have addressed Elias's comment about her preference for supervising white males under the age of 40. The City maintains that in permitting this "expert" opinion, the court gave Van Blaricom license to "second-guess Chief O'Toole's personnel decisions." The City asserts that if this is proper expert opinion testimony, "any plaintiff challenging a manager's decision in any employment case could simply hire a manager who once served in a similar role to offer 'expert' testimony that plaintiff's manager made the wrong decisions."

If relevant, however, expert testimony describing good and bad police practices is admissible.[48] Here, the officers claimed that the SPD transferred them as a retaliatory measure. Van Blaricom was a police officer for the city of Bellevue for 29 years and was chief of police for the last 11 of those years. His testimony about the propriety of the SPD's management decisions based on his experience and knowledge of police practices was therefore relevant. In

---

[48] See Davis v. Mason County, 927 F.2d 1473, 1484-85 (9th Cir. 1991) (affirming the trial court's decision to admit D.P. Van Blaricom's testimony that Sheriff Stairs was reckless in failing to adequately train his employees who were found liable for damages for using excessive force).

-24-

addition, the jury is unlikely to be familiar with best practice for resolving conflict within a police department. Van Blaricom's testimony therefore assisted the jury in accordance with ER 702.

The City also asserts that Van Blaricom offered a legal conclusion and thus violated the province of the jury. ER 704 prohibits experts from offering legal conclusions, including opinion "testimony that the defendant's conduct violated a particular law."[49] "Such an improper opinion undermines a jury's independent determination of the facts, and may invade the defendant's constitutional right to a trial by jury."[50] Van Blaricom testified that the SPD's actions suggested that "there's some ulterior motive." The City contends that this testimony violated the court's order in limine prohibiting him from opining on whether the SPD "retaliated" and assumed the jury's role. A statement that the SPD had an ulterior motive, however, is not equivalent to a statement that the SPD retaliated. As the officers claim, Van Blaricom did not say what the ulterior motive was or explicitly state any legal conclusions that the order in limine prohibited. The trial court therefore did not abuse its discretion in allowing Van Blaricom to testify as an expert or testify that he believed the SPD had an ulterior motive.

---

[49] State v. Olmedo, 112 Wn. App. 525, 532, 49 P.3d 960 (2002).
[50] Olmedo, 112 Wn. App. at 530-31.

6.  Mitigation Instruction

The City asserts that the trial court abused its discretion when it did not provide the jury with the City's proposed mitigation instruction. It claims this deprived the City of its failure-to-mitigate defense.

We review a trial court's jury instructions for abuse of discretion.[51] "A trial court does not abuse its discretion in instructing the jury, if the instructions: (1) permit each party to argue its theory of the case; (2) are not misleading; and (3) when read as a whole, properly inform the trier of fact of the applicable law."[52] The court's failure to give a necessary instruction requires reversal only if it was prejudicial.[53]

The City's proposed mitigation instruction mirrored Washington pattern jury instruction 330.83.[54] The proposed instruction told the jury to reduce damages if the City proved that either Elias or Proudfoot unreasonably failed to reduce or avoid damages. The City claims that the court's failure to give this instruction prevented it from arguing that Proudfoot failed to mitigate his damages. Economist expert Tapia's damages calculation assumed that Proudfoot would have become an assistant chief in April 2015. The City

---

[51] Herring, 81 Wn. App. at 22.
[52] Herring, 81 Wn. App. at 22-23.
[53] Herring, 81 Wn. App. at 23.
[54] 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 330.83, at 396 (2012).

-26-

contends that Proudfoot failed to mitigate his damages when he did not apply for the position.

Judge Downing provided the following explanation for not giving the mitigation instruction:

> You know, the burden of proof remains upon the plaintiff to establish damages, and so whether it's treated as a duty to mitigate with the burden of proof allocated to the defense, it seems to me it's simpler in a case of this nature, given the evidence that was presented, to simply argue failures on the plaintiffs' part to meet the burden, rather than asserting a mitigation.

As stated by Judge Downing, without a mitigation instruction, the City still could argue that the jury should not award Proudfoot damages based on an assistant chief's salary because he never applied for the position. The City highlighted this issue during its cross-examination of both Tapia[55] and O'Toole[56] but failed to pursue it during its closing. A tactical decision by the City and not an instructional error by the court caused this omission.

The City also may be asserting that it was unable to argue its theory of the case for Elias. The City contends that Tapia overestimated Elias's damages because Tapia did not consider any overtime Elias actually earned after the SPD

---

[55] During its cross-examination of Tapia, the City underscored that she based her damages calculations on the assumption that Proudfoot would have obtained an assistant chief position. In addition, she stated that although she was aware that Proudfoot had discussed the assistant chief position with O'Toole, she did not know whether he had actually applied for it.

[56] Chief O'Toole testified that to the best of her knowledge, Proudfoot did not apply for an assistant chief position.

transferred her. It claims that "Elias asked the jury to award her damages <u>as if</u> <u>she had failed to mitigate her damages</u>." (Emphasis added.) If the court had given its instruction, the City maintains that a jury "would have awarded [Elias], at most, nominal past economic damages arising from overtime lost in the transition to her new West Precinct position." But a mitigation instruction does not ask the jury to reduce damages because a plaintiff appropriately mitigated them; it asks the jury to reduce damages because a plaintiff unreasonably failed to do so. The trial court's failure to give the City's mitigation instruction is therefore not relevant to the City's theory of the case for Elias.

Because the City was able to argue that Proudfoot failed to mitigate his damages, the trial court did not abuse its discretion in failing to submit the City's proposed mitigation instruction.

7.    Cumulative Errors

Finally, the City asserts that the alleged errors cumulatively require a new trial. "The cumulative error doctrine applies 'when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial.'"[57] When the errors have little or no effect on the outcome at trial, no new trial is required.[58] Because we did not identify any prejudicial misconduct or error, the cumulative error doctrine does

---

[57] In re Pers. Restraint of Morris, 176 Wn.2d 157, 172, 288 P.3d 1140 (2012) (quoting State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000)).
[58] Morris, 176 Wn.2d at 172.

-28-

not apply. The trial court did not abuse its discretion in not granting a remittitur or a new trial based on grounds of prejudice.

### Attorney Fees

The officers request an award of reasonable attorney fees on appeal. They rely on RCW 49.60.030(2). This statute grants reasonable attorney fees, both at the trial court and on appeal, to individuals who suffer violations of the WLAD.[59] Because the statute entitles the officers to reasonable attorney fees, we award the officers attorney fees as the prevailing party on appeal.

### CONCLUSION

We affirm. Substantial evidence supports the jury's economic and noneconomic damages awards. The awards do not shock the conscience and were not the result of passion or prejudice. The City fails to show that the trial court abused its discretion when it denied both a remittitur and a new trial.

WE CONCUR:

---

[59] RCW 49.60.210.